# EXHIBIT 1



**Capitol Corporate Services, Inc.**
PO Box 1831
Austin, TX 78767
Phone: (800) 345-4647  Fax: (800) 432-3622
rassop@capitolservices.com

## Service Of Process Transmittal Notice

| | | |
|---|---|---|
| ABBY DIAZ<br>TYLER TECHNOLOGIES INC<br>ONE TYLER DR<br>YARMOUTH MAINE 04096 | **Date Processed:** | 07/27/2023 |
| | **Completed By:** | R. VAUGHN |
| | **Delivery Method to Client:** | FEDEX 2 DAY |
| | **Tracking Number:** | 781710249157 |

Enclosed please find legal documents received on behalf of the client named below. These documents are being forwarded in accordance with your instructions.

| **Date / Time Received**<br>07/27/2023 12:30 PM in MICHIGAN | **Transmittal #**<br>MI-252446 | **Delivered to Agent by**<br>CERTIFIED MAIL |
|---|---|---|

| **With Regard to Client** |
|---|
| TYLER TECHNOLOGIES, INC. |

| **Title of Case or Action** |
|---|
| GENESEE COUNTY 911 CONSORTIUM V. TYLER TECHNOLOGES |

| **Case Number** | **Type of Document Served** |
|---|---|
| 7TH CIRCUIT COURT | CITATION/SUMMONS |

| **Court Name** |
|---|
| 23-119318-CK |

| **Note** |
|---|
| |



1-252446H

# GMH GIARMARCO, MULLINS & HORTON, P.C.

## ATTORNEYS & COUNSELORS AT LAW

Troy ▼ Lansing ▼ Detroit ▼ Munising ▼ Florida

| | | | | | |
|---|---|---|---|---|---|
| **ANTHONY K. CHUBB, ESQ.**<br>DIRECT DIAL: 248.457.7054<br>CELL: 734.834.1906<br>EMAIL: ACHUBB@GMHLAW.COM | John A. Anderson<br>Peter J. Bill<br>Michael L. Bosnic<br>Robert A. Bryant<br>Thomas P. Cavanaugh<br>Kenneth B. Chapie<br>Anthony K. Chubb<br>John C. Clark<br>Travis M. Comstock<br>George A. Contis<br>Kellie S. DeVito | Samantha S. Faulkner<br>Elizabeth A. Favaro<br>Kara S. Ferrara<br>Timothy D. Finegan<br>John R. Fleming<br>John J. Giarmarco<br>Julius H. Giarmarco<br>Bruce W. Haffey<br>William H. Heritage, III<br>Stephen J. Hitchcock<br>William H. Horton | Keela P. Johnson<br>Salvatore J. LaMendola<br>Alexander Lebedinski<br>Victoria S. Lehman<br>Adam Levitsky<br>Ryan P. McNeil<br>Christopher D. Messing<br>John L. Miller<br>Karie Miller<br>Robert A. Mills<br>Timothy J. Mullins | David A. Occhiuto<br>Ryan L. Perry<br>Dennis M. Rauss<br>James Y. Rayis<br>Dacian M. Rusz<br>Annabel F. Shea<br>Kathleen A. Stearns<br>Lauren M. Studley<br>Paul A. Thursam<br>Jared M. Trust<br>Geoffrey S. Wagner | Donald K. Warwick<br>Matthew S. Weaver<br>Richard A. Wojewoda<br>LeRoy H. Wulfmeier, III<br><br>Of Counsel:<br><br>David G. Gorcyca<br>Albert Taylor Nelson, Jr.<br>Peter J. Sarkesian<br>Lawrence F. Schiller |

July 25, 2023

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Tyler Technologies
Resident Agent: Capitol Corporate Services, Inc.
186 N. Main Street, 2nd Floor, Ste. 1
Plymouth, MI 48170

> **Re:** ***Genesee County 911 Consortium v Tyler Technologies Inc.***
> **Genesee Circuit Case No. 23-119318-CK**

Dear Sir or Madam:

Enclosed you will find the Summons and Verified Complaint for Money Damages and Demand for Trial by Jury.

We look forward to Tyler Technologies response to same.

Very truly yours,

**GIARMARCO, MULLINS & HORTON, P.C.**

Anthony K. Chubb

AKC/jms
Enclosure

Approved, SCAO

| | Original - Court<br>1st copy - Defendant | CELESTE D. BELL<br>P-41453 | 2nd copy - Plaintiff<br>3rd copy - Return |

| STATE OF MICHIGAN | | SUMMONS | CASE NO. |
|---|---|---|---|
| 7th | JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | | 23 -        - CK<br>23-119318-CK |

**Court address**
900 SAGINAW STREET, FLINT, MI 48502

Court telephone no.
810-424-4355

| Plaintiff's name(s), address(es), and telephone no(s).<br>GENESEE COUNTY 911 CONSORTIUM<br>4481 Corunna Road<br>Flint, MI 48532<br>(810) 732-9911 | v | Defendant's name(s), address(es), and telephone no(s).<br>TYLER TECHNOLOGIES<br>Resident Agent: Capitol Corporate Services, Inc.<br>186 N. Main Street, 2nd Floor, Ste. 1<br>Plymouth, MI 48170 |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>ANTHONY K. CHUBB (P72608)<br>Giarmarco, Mullins & Horton, P.C.<br>101 W. Big Beaver Road, 10th Floor<br>Troy, MI 48084<br>achubb@gmhlaw.com          (248) 457-7054 | | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case
☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☑ is no longer pending.

Summons section completed by court clerk.          **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>7/25/23 | Expiration date:<br>10/24/23 | Court clerk<br>Brenda Jordan |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01    (9/19)    **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

| | SUMMONS |
|---|---|
| **PROOF OF SERVICE** | Case No.   23 -         - CK |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

|  ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:  (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that:  (notarization required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.
Date

My commission expires: _____   Signature: _____
Date                                    Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____ on behalf of _____
Day, date, time

_____
Signature

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

**GENESEE COUNTY 9-1-1- CONSORTIUM,**

        Plaintiff,

    Case No. 23 - _119318_ - CK

v

    Hon.   **CELESTE D. BELL**

**TYLER TECHNOLOGIES, INC.,**
a Delaware corporation,

        **P-41453**

        Defendant.

---

ANTHONY K. CHUBB (P72608)
CHRISTOPHER D. MESSING (P78900)
Attorneys for Plaintiff
GIARMARCO, MULLINS & HORTON PC
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084
(248) 457-7000; Fax: (248) 457-7001
achubb@gmhlaw.com
cmessing@gmhlaw.com

A TRUE COPY
GENESEE COUNTY CLERK

---

## VERIFIED COMPLAINT FOR MONEY DAMAGES
## AND DEMAND FOR TRIAL BY JURY

There is no other pending or resolved civil action arising out
of the transaction or occurrence alleged in the complaint.
MCR 1.109(D)(2)(a)(i).

        _/s/ Anthony K. Chubb_
        ANTHONY K. CHUBB (P72608)

NOW COMES the Plaintiff, GENESEE COUNTY 9-1-1 CONSORTIUM, by and

through counsel, GIARMARCO, MULLINS & HORTON, P.C. and for its Verified Complaint

for Money Damages, states as follows:

GIARMARCO, MULLINS & HORTON, P.C.
ATTORNEYS AND COUNSELORS AT LAW

## THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, GENESEE COUNTY 9-1-1- CONSORTIUM ("911"), is a Michigan organization, with its principal place of business in Genesee County, Michigan, which provides dispatching services to law enforcement and emergency services agencies throughout Genesee County, and conducts business in Genesee County, Michigan.

2. Defendant, TYLER TECHNOLOGIES, INC. ("Tyler"), is a Delaware corporation, with its principal place of business in the State of Texas, which provides technological systems, software licensing, and related services, and conducts business in Genesee County, Michigan.

5. The present lawsuit arises out of Tyler's breach of the License and Services Agreement ("Agreement") entered into between the parties for products and services to be provided and performed in Genesee County, Michigan.

6. Plaintiff 911 seeks damages in the present controversy in excess of $25,000.00 and jurisdiction is proper in this Court.

## FACTUAL ALLEGATIONS

6. On or about December 15, 2020, 911 and Tyler entered into the Agreement. Under the Agreement, Tyler agreed to create and implement for 911 a county-wide emergency dispatch system, law enforcement records management system, and other related systems. In so doing, Tyler was obligated to provide 911 with software licenses to its own software and third-party software and perform various services in relation to the software system. A copy of the Agreement is attached to this Complaint as *Exhibit 1*.

7. Those products and services included: Tyler's Computer-Aided Dispatch (CAD) software, law enforcement records management system software, mobile software, and other software; services including project management, software installation and implementation,

2

training, go-live support, configuration, maintenance, and other services; and third-party hardware and software, and related services.

8.   The Tyler system was to support the various dispatch and law enforcement related activities of 25 distinct agencies throughout Genesee County, referred to as "Affiliated Organizations." *Exhibit 1*, Figure 1.

9.   The Agreement set out a series of deadlines for the provision of software licenses, implementation of the software, as well as service, maintenance, and training related to the use of the software. The project plan and each deadline was spread out over eight "Milestones." Tyler planned to invoice 911 for the software licenses, services, etc., at each Milestone. A summary of the products and services expected at each Milestone follows below:

| Software/Licensing Fees | Professional Services |
|---|---|
| Milestone 1 – Effective Date | Milestone 1 – Effective Date |
| Milestone 5 – Project Plan Approval & 3rd party software | Milestone 2 – Project Plan Approval |
| Milestone 6 – Initial System deployment | Milestone 3 – Initial System deployment |
| Milestone 7 – End user training | Milestone 4 – End User Training |
| Milestone 8 – 45 days after the Tyler software has gone live | Milestone 5 – 45 days after go-live and has operated in an environment w/o a Priority 1 or 2 defect |

10.   The parties included a Maintenance and Support Agreement, attached to the Agreement as Exhibit C. The Agreement held that, as long as 911 had a Maintenance and Support Agreement in place, any maintenance and support services needed in relation to issues with the computer system or any software component of the system would be provided free of charge for the first year. After the first year, any maintenance and support requests would be invoiced.

11.   The Agreement contained several additional contract documents attached to it as exhibits. The additional contract documents included: Investment Summary, Invoicing and

Payment Policy, Business Travel Policy, Maintenance and Support Agreement, Support Call Process, Third Party End User License Agreement(s), Implementation and Training Support Services, Additional Terms for New World Public Safety and Brazos Hosted Components, Service Level Agreement for Hosted Components, and Socrata Terms and Conditions.

12. Under the Agreement, Tyler was to provide 911 with the licenses to its own software and other third-party software. *Exhibit 1*, Section B(1). These were to be implemented and invoiced pursuant to Milestones 1-3.

13. Under the Agreement, Tyler was to provide 911 with professional services related to the installation, implementation, and configuration of Tyler and third-party software. These were to be rendered and invoiced pursuant to Milestones 1-5. Additional professional services related to the initial system deployment and 45 days after the system was scheduled to go live were to be rendered and invoiced pursuant to Milestones 6 and 8.

14. Under the Agreement, Tyler was to provide 911 with End User training, which was estimated to occur during Q1 of 2022 and to be rendered and invoiced pursuant to Milestone 7.

15. Tyler invoiced 911 for all software license fees and professional services, as well as expenses incurred by Tyler employees during the course of providing support and training services to 911, up through Milestone 7.

16. 911 paid all of Tyler's invoices up through September 19, 2022. The last invoice was paid on October 11, 2022, and was for the remaining 25% of software license fees due under the Invoice and Payment Schedule.

17. 911 has paid Tyler over $1,339,000.00.

18. Despite the fact that Tyler invoiced 911 several times for software licenses and professional services rendered, the software was defective, and all attempts by Tyler to remedy the defects were ineffective.

19. 911 has provided Tyler notice of the defects in the software on numerous occasions. To date, Tyler has yet to remedy those defects.

24. By failing to abide by their contractual obligations to provide 911 with a software system conforming to the descriptions set forth in the Agreement, and by failing to remedy the defects within a reasonable time after being notified of these defects, Tyler materially breached the Agreement.

25. Because Tyler perpetually failed to provide 911 with functional software and effective services, while 911 has not received any benefit in return for the more than $1,339,000.00 paid to Tyler, Tyler has been unjustly enriched.

26. Tyler knew that it would not be able to accommodate 911's clearly conveyed needs, yet Tyler continuously represented that it could accommodate 911's needs during the period of time before the Agreement was negotiated, during the formation of the Agreement, and during the course of performance.

27. Tyler knew about the defects with its software and services yet perpetually failed to remedy them. Despite this, Tyler represented their software and services as conforming to the Agreement. Because 911 relied on Tyler's misrepresentations, and since Tyler had reason to know of 911's misplaced reliance, Tyler is liable for fraud.

28. Tyler retained the monies paid to it by 911 for work that was supposed to go toward licensing and related services pursuant to the Agreement. Tyler failed to apply these monies toward the provision of conforming software and services to 911 under the Agreement, and

instead used the monies for personal gain or to pay off other debts. As such, Tyler is liable for conversion.

29. As a result of the above-described incidents, 911 has incurred and continues to incur damages. Furthermore, 911 has suffered and continues to suffer harm.

## COUNT I
## BREACH OF CONTRACT

30. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

31. 911 and Tyler entered into the Agreement, which is valid and enforceable.

32. 911 performed its obligations under the Agreement with Tyler.

33. Tyler has failed to fulfill its obligations under the Agreement by failing to: (1) provide 911 with a functional software suite in compliance with the terms of the Agreement; (2) provide services on schedule; (3) provide effective, workmanlike professional services consistent with industry standards; (4) provide effective, workmanlike maintenance and support to remedy the defects within the software suite, despite 911 repeatedly placing Tyler on notice of the issues present; and (5) implement a substantially functional system by the scheduled go-live date, which ultimately never took place due to Tyler's material breaches of the Agreement.

34. For over a year, 911 continued to notify Tyler of the issues with the software and the ineffective services, and repeatedly requested that Tyler resolve the issues. 911's notifications were either ignored, discarded by Tyler, or addressed and attempted to be resolved, but to no avail and/or in an ineffective and unworkmanlike fashion.

35. Tyler inadequately fulfilled or failed to complete initial project Milestones and failed to reach later Milestones altogether.

6

36. Nevertheless, Tyler continued to invoice 911 for the defective products and for services that were not rendered in a manner consistent with Tyler's contractual obligations. 911 was charged for: defective software and hardware; ineffective maintenance and support to remedy the defects; training and training-related expenses that were ineffective and ultimately useless due to the defects with the software suite, or the failure of Tyler employees that had crucial knowledge of how to fix the defects to attend scheduled maintenance and training sessions; and other defective products and ineffective services.

37. Despite this, Tyler expected full and timely payment for each invoice. 911 paid the invoices, each time relying on Tyler's repeated assurances that all defects and breaches would be cured.

38. Tyler materially breached its Agreement with 911.

39. After each material breach, and after 911 gave Tyler multiple opportunities to cure the breaches over the course of more than a year, 911 notified Tyler on May 5, 2023, that it was terminating the Agreement.

41. As a result of Tyler's material breach, 911 has been damaged in an amount exceeding $1,339,000.00, exclusive of contractual and statutory interest, and other damages and expenses resulting from the actions described above, to which 911 is entitled.

42. Alternatively, as a result of Tyler's failure to implement the computer system the parties had contracted for, 911 has been damaged in implementing alternative solutions, plus any remaining amount of invoices paid to Tyler, contractual and statutory interest, and other damages and expenses resulting from the actions described above, and will continue to incur damages.

7

WHEREFORE, Plaintiff requests that this Honorable Court enter a judgment that awards Plaintiff monetary damages in excess of $25,000.00, plus contractual and statutory interest, and other damages and expenses resulting from the actions described above, and its expenses and court costs, and for such other relief that this Court deems just and equitable.

## COUNT II
## BREACH OF EXPRESS WARRANTY

43. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

44. Tyler made the following express warranty about the software provided to 911:

> We warrant that the Tyler Software will be without Defect(s) as long as you have a Maintenance and Support Agreement in effect. If the Tyler Software does not perform as warranted, we will use all reasonable efforts, consistent with industry standards, to cure the Defect as set forth in the Maintenance and Support Agreement.

[*Exhibit 1*, Section B(4)].

45. Tyler breached this express warranty by providing 911 with defective software.

46. Tyler further breached this express warranty by failing to cure defects as warranted or by refusing to cure defects altogether.

47. Tyler made the following express warranty about the professional services to be provided to 911:

> We will perform the services in a professional, workmanlike manner, consistent with industry standards. In the event we provide services that do not conform to this warranty, we will re-perform such services at no additional cost to you.

[*Exhibit 1*, Section C(5)].

48. Tyler breached this express warranty by failing to provide 911 with professional services as warranted.

8

49. Tyler further breached this express warranty by failing to re-perform professional services that did not originally occur as warranted.

51. Tyler made the following express warranties about SaaS and related services:

> Tyler warrants to Client that the functionality or features of the SaaS Services will substantially perform as communicated to Client in writing, or their functional equivalent, but Tyler has the right to update functionality. The support policies may change but will not materially degrade during the term. Tyler may deprecate features upon at least 30 days' notice to Client, but Tyler will use commercially reasonable efforts to support the previous features for at least 6 months following the deprecation notice.

[*Exhibit 1*, Section C(1.1)].

52. Regarding Uptime Service Level, Tyler warranted: "[w]e will use commercially reasonable efforts to maintain the online availability of the SaaS Service for a minimum of availability in any given month…." (*Exhibit 1*, Section C(1.2)).

53. Tyler breached these express warranties by failing to provide an API compatible with customer use.

54. Tyler breached these express warranties by failing to provide the functionality and features of various other SaaS services or failing to remedy dysfunctional, nonconforming SaaS services as outlined in the Agreement.

55. Tyler conducted several demonstrations of the systems and products being offered to 911. The demonstrations portrayed Tyler Software systems as functional as well as compatible with 911's particular needs—which 911 communicated to Tyler and Tyler understood.

56. These demonstrations, as a model of the software considered by 911, were made part of the basis of the bargain between the parties.

9

57. In conducting these demonstrations, Tyler created two express warranties: (1) that the software system provided to 911 would conform to the functional model demonstrated, and (2) that the software system provided to 911 would fulfill and be compatible with 911's particular needs.

58. Tyler breached the express warranties created by demonstration by: (1) providing a software system that did not conform to the model demonstrated; and (2) providing a software system that was both non-functional and incompatible with 911's particular needs.

59. 911 notified Tyler of the various failures of the Tyler Software and services to conform to all of the foregoing express warranties made in the Agreement and by demonstration within a reasonable time after the breaches were discovered.

60. As a result of Tyler's breaches of the express warranties made in the Agreement and by demonstration, 911 has been damaged in excess of $25,000.00 for actual, consequential, and incidental losses.

WHEREFORE, Plaintiff requests that this Honorable Court enter a judgment that awards Plaintiff monetary damages in excess of $25,000.00, plus contractual and statutory interest, and other damages and expenses resulting from the actions described above, and its expenses and court costs, and for such other relief that this Court deems just and equitable.

## COUNT III
## UNJUST ENRICHMENT

61. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

62. Tyler invoiced, and was compensated by 911, for substantially defective software and other related products and services that were ineffective, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all.

10

63. Tyler accepted the benefit conferred upon it by 911 and refused to refund the benefit after being notified of the issues with the computer system, software, and services.

64. Tyler continues to seek additional benefit by continuing to invoice 911 for charges 911 had properly disputed, and/or products and services after 911 had properly terminated the Agreement.

65. The total sum wrongfully invoiced by Tyler, and paid by 911, exceeds $1,339,000.00.

66. Tyler has been unjustly enriched because it improperly invoiced and collected amounts as set forth above and has refused to refund 911 those costs.

67. Equity dictates that 911 be compensated for the money it paid to Tyler.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment that awards Plaintiff monetary damages in excess of $25,000.00, plus contractual and statutory interest, and other damages and expenses resulting from the actions described above, and its expenses and court costs, and for such other relief that this Court deems just and equitable.

## COUNT IV
## FRAUD IN THE INDUCEMENT

68. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

69. Prior to entering into the Agreement, Tyler knowingly or recklessly made false, misleading, and material representations about the functional capabilities of their software products and services and the timeline to implement said products. These misrepresentations were made with the intention that 911 would act upon them by entering into the Agreement and/or following Tyler's recommendations during the course of performance.

11

70. Tyler made material misrepresentations to 911 that they would provide functional software products and render effective services under the Agreement such that would meet 911's stated particular needs.

71. Tyler knew that its representations were false at the time they were made, and/or made them recklessly without knowledge of their truth. Tyler knowingly had no intention and/or capability of providing 911 with the products and services in contracted to provide.

72. In making these material misrepresentations, Tyler intended to induce, and did induce, 911 into assenting to the Agreement.

73. Tyler knew that 911 relied upon Tyler employees' opinions, recommendations, and expertise, as 911 continued to pay invoices.

73. 911 continued paying invoices in reliance on Tyler's continued misrepresentations and false assurances that they would provide 911 with conforming products and services, that their maintenance and support services would remedy any defects, and that the system would successfully go live by a reasonable date.

74. Tyler improperly invoiced 911 for software and other products, and for services, that were not provided in accordance with the Agreement, or that were not provided at all.

75. As a result of Tyler's malicious, intentional, and/or reckless actions described above, which were undertaken in bad faith, with knowledge, and with an intent to mislead and induce 911, 911 has been damaged in an amount exceeding $1,339,000.00, and continues to suffer damages.

WHEREFORE, Plaintiff requests that this Honorable Court enter a judgment that awards Plaintiff monetary damages in excess of $25,000.00, plus contractual and statutory

interest, and other damages and expenses resulting from the actions described above, and its expenses and court costs, and for such other relief that this Court deems just and equitable.

## COUNT V
## FRAUD

76. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

77. Pursuant to the Agreement, Tyler was authorized only to invoice for software and services that substantially conformed to the functional descriptions set forth in their written proposal to 911.

78. Tyler wrongly issued Invoice No. 130-119545 on February 28, 2021, for embedded third party software, in the amount of $54,500.00. The software was defective and failed to conform to the functional description in their written proposal. The invoice was paid by 911 on April 12, 2021.

79. Tyler wrongly issued Invoice No. 130-119543 on February 28, 2021, for 50% of the total software license fees, in the amount of $513,999.00. The corresponding software was defective and failed to conform to the functional description in their written proposal. The invoice was paid by 911 on April 12, 2021.

80. Tyler wrongly issued Invoice No. 130-119544 on February 28, 2021, for 20% of the total of professional services to be rendered, in the amount of $53,723.00. These services were to include "training, project management, systems assurance, standard interfaces, and configuration." Such were ineffective, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. The invoice was paid by 911 on April 12, 2021.

81. Tyler wrongly issued Invoice No. 130-121152 on May 31, 2021, for 20% of the total of professional services to be rendered, in the amount of $53,723.00. These services were to include "training, project management, systems assurance, standard interfaces, and configuration." Such were ineffective, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. The invoice was paid by 911 on July 13, 2021.

82. Tyler wrongly issued Invoice No. 130-121349 on June 16, 2021, for expenses incurred by Tyler employee Ronald Wolbert for services/training on June 11, 2021, in the amount of $1,760.65. The expenses included parking, airfare, per diem rates, lodging, mileage, and car rental costs. Wolbert's services were ineffective, failed to correct defects, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage was not permitted under the Agreement. The invoice was paid by 911 on July 5, 2021.

83. Tyler wrongly issued Invoice No. 130-121898 on July 12, 2021, for 20% of the total of professional services rendered, in the amount of $53,723.00. These services were to include "training, project management, systems assurance, standard interfaces, and configuration." Such were ineffective, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. The invoice was paid by 911 on August 10, 2021.

84. Tyler wrongly issued Invoice No. 130-122187 on July 21, 2021, for expenses incurred by Tyler employee Ryan Enderich for services/training from July 15, 2021 through July 16, 2021, in the amount of $751.54. The expenses included parking, airfare, per diem rates, lodging, mileage, and car rental costs. Enderich's services were ineffective, failed to

14

adequately address defects and concerns, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage was not permitted under the Agreement. The invoice was paid by 911 on August 23, 2021.

85. Tyler wrongly issued Invoice No. 130-122231 on July 31, 2021, for expenses incurred by Tyler employee Patsy LaPointe for services/training on July 15, 2021, in the amount of $744.78. The expenses included per diem rates, lodging, and mileage. LaPointe's services were ineffective, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on August 24, 2021.

86. Tyler wrongly issued Invoice No. 130-123205 on September 15, 2021, for a 3-year subscription to Red Hat Enterprise Linux Server, in the amount of $2,500.00. The software was defective and/or unnecessary given the inability of 911 to utilize the corresponding Tyler software. The invoice was paid by 911 on October 11, 2021.

87. Tyler wrongly issued Invoice No. 130-123422 on September 29, 2021, for expenses incurred by Tyler employee Ronald Wolbert for services/training on September 24, 2021, in the amount of $1,627.19. The expenses included parking, airfare, per diem rates, lodging, mileage, and car rental costs. Wolbert's services were ineffective, failed to address known defects, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on October 8, 2021.

88. Tyler wrongly issued Invoice No. 130-123882 on October 21, 2021, for expenses incurred by Tyler employee Ryan Enderich for services/training from October 14, 2021 through October 15, 2021, in the amount of $757.57. The expenses included per diem rates, lodging, mileage, and car rental costs. Enderich's services were ineffective, failed to address functional defects, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on November 2, 2021.

89. Tyler wrongly issued Invoice No. 130-124305 on October 28, 2021, for expenses incurred by Tyler employee Ryan Enderich for services/training on October 22, 2021, in the amount of $450.15. The expenses included per diem rates, parking, mileage, and car rental costs. Enderich's services were ineffective, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on November 12, 2021.

90. Tyler wrongly issued Invoice No. 130-124315 on October 31, 2021, for expenses incurred by Tyler employee Ryan Enderich for services/training on October 22, 2021, in the amount of $319.68. The expenses included lodging. Enderich's services were ineffective, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on November 12, 2021.

91. Tyler wrongly issued Invoice No. 130-125142 on December 15, 2021, for 25% of the total software license fees, in the amount of $256,999.50. The corresponding software

16

failed to substantially conform to the functional descriptions set forth in their written proposal to 911. The invoice was paid by 911 on January 11, 2022.

92. Tyler wrongly issued Invoice No. 130-125226 on December 16, 2021, for expenses incurred by Tyler employee Ronald Wolbert for services/training on December 6, 2021, and December 10, 2021, in the amount of $1,596.26. The expenses included parking, airfare, per diem rates, lodging, mileage, and car rental costs. Wolbert's services were ineffective, failed to address functional defects, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on December 27, 2021.

93. Tyler wrongly issued Invoice No. 130-126572 on February 23, 2022, for expenses incurred by Tyler employees Anthony Favreau and Jason Frost for services/training between February 7, 2022, and February 11, 2022, in the amount of $1,837.01. The expenses included airfare, per diem rates, lodging, parking, mileage, and car rental costs between both employees. Favreau's and Frost's services were ineffective, failed to address functional defects, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on March 7, 2022.

94. Tyler wrongly issued Invoice No. 130-126701 on February 28, 2022, for expenses incurred by Tyler employee Ronald Wolbert for services/training on February 21, 2022, and February 25, 2022, in the amount of $1,507.08. The expenses included parking, airfare, per diem rates, lodging, mileage, and car rental costs. Wolbert's services were ineffective, failed to address functional defects, not rendered in a workmanlike manner, not rendered consistent

with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on March 31, 2022.

95. Tyler wrongly issued Invoice No. 130-126903 on March 17, 2022, for Geo-File Maintenance Software for the period between June 1, 2021 and May 31, 2022, in the amount of $6,000.00. The software was functionally defective and failed to substantially conform to the functional descriptions set forth in their written proposal. The invoice was paid by 911 on April 12, 2022.

96. Tyler wrongly issued Invoice No. 130-127376 on April 15, 2022, for Brazos Mobility Hosting Annual Fee, in the amount of $3,000.00. The Brazos software was functionally defective and failed to substantially conform to the functional descriptions set forth in their written proposal. The invoice was paid by 911 on May 10, 2022.

97. Tyler wrongly issued Invoice No. 130-127619 on April 27, 2022, for expenses incurred by Tyler employee Ryan Enderich for training from April 14, 2022, through April 15, 2022, in the amount of $891.30. The expenses included lodging, per diem rates, mileage, and car rental costs. Enderich's services were ineffective, failed to address and correct functional defects, not rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. Furthermore, the invoicing of both rental car fees and mileage is not permitted under the Agreement. The invoice was paid by 911 on May 2, 2022.

98. Tyler wrongly issued Invoice No. 130-129238 on July 1, 2022, for pro-rated annual maintenance, in the amount of $61,635.00. The services to be rendered included maintenance on several software components of the computer system. The services were ineffective, not

rendered in a workmanlike manner, not rendered consistent with industry standards, or not rendered at all. The invoice was paid by 911 on October 11, 2022.

99. Tyler wrongly issued Invoice No. 130-130752 on September 19, 2022, for the remaining 25% of the total software license fees, in the amount of $256,999.50. The corresponding software was defective and failed to substantially conform to the functional descriptions set forth in their written proposal to 911. The invoice was paid by 911 on October 11, 2022.

100.      Pursuant to Michigan law, common law fraud is the receipt and retention of unmerited benefits. *Goodrich v Waller*, 314 Mich 456, 469; 22 NW2d 862 (1946).

101.      Upon information and belief, Tyler was aware that the invoices were in breach of the Agreement, and as such constituted an intent to deceive and therefore constitute actual fraud pursuant to Michigan law. *Id.* at 461-62.

102.      As a result of the foregoing, 911 is entitled to the repayment of wrongfully invoiced amounts in excess of $1,339,000.00, as well as exemplary damages.

WHEREFORE, Plaintiff requests that this Honorable Court enter a judgment that awards Plaintiff monetary damages in excess of $25,000.00, plus contractual and statutory interest, and other damages and expenses resulting from the actions described above, and its expenses and court costs, and for such other relief that this Court deems just and equitable.

## COUNT VI
## CONVERSION

103.      Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully restated herein.

19

104.     Upon information and belief, Tyler intentionally induced 911 into a contract, materially breached said contract, and in doing so, unjustly received into its possession monies properly belonging to 911.

105.     Tyler refused to return those monies upon the demand of 911, and in doing so, converted and retained those monies for its own use or benefit.

106.     Pursuant to MCL 600.2919a, 911 is entitled to recover treble the actual damages sustained as a result of the conversion, in addition to reasonable attorney's fees and costs.

### RELIEF REQUESTED

WHEREFORE, Plaintiff 911 requests that this Honorable Court enter a judgment as follows:

a.  Awarding 911 damages arising from the above-stated causes of action against Tyler;

b.  Trebling the damages awarded;

c.  Awarding reasonable attorney's fees and costs;

d.  Awarding exemplary damages in an amount deemed fair and equitable against 911 as a result of a finding of fraud against Tyler; and

e.  Granting any other relief deemed fair and equitable under the circumstances.

*{Page break intentional – verification and signature to follow}*

20

I declare the above to be true and accurate to the best of my knowledge, information, and belief.

GENESEE COUNTY 9-1-1 CONSORTIUM

By: Tim Jones
Its: Executive Director

**GIARMARCO, MULLINS & HORTON, PC**

By: */s/ Anthony K. Chubb*
ANTHONY K. CHUBB (P72608)
Attorney for Plaintiff
101 West Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7054
achubb@gmhlaw.com

Dated: July ___, 2023

## DEMAND FOR JURY TRIAL

Plaintiff, GENESEE COUNTY 9-1-1 CONSORTIUM, hereby demands a jury on all issues so triable herein.

**GIARMARCO, MULLINS & HORTON, PC**

By: */s/ Anthony K. Chubb*
ANTHONY K. CHUBB (P72608)
Attorney for Plaintiff
101 West Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7054
achubb@gmhlaw.com

Dated: July ___, 2023

21

# EXHIBIT 1

# Tyler Technologies, Inc. – Public Safety Division

| New Contract | New/Upgrade | | Upgrade | 3rd Party | Services | | SSMA |

**Customer:** **Genesee County 911 MI**      **NWPS No:** **NEW**      **Softrax No:** **52117 (?)**

**Population:** **405,813**      **Platform:** **ENT**      **Original NWPS Contract Date:** **12-15-20**

**Contract ID No** **2019-29221-8**      **Project:** **Combined CAD, LERMS, Mobile, Brazos, Socrata**

**Signature Date:** **12-15-20**      **Distribution Date:** **12-16-20**

---

## PRO SERVICES / CLIENT SUCCESS / DEVELOPMENT

- ☐ Erin Miller, SVP Operations
- ☐ Kevin Flynn, VP Professional Services
- ☐ Malcolm Logan
- ☐ Tammi Dorsey
- ☐ Larry Piper
- ☐ Ryan Martin
- ☐ Sean Gallagher
- ☐ Britt Wollenweber
- ☐ Ray Taylor
- ☐ Ryan Yoakam
- ☐ Teri Oger
- ☐ Jonathan Cook
- ☐ Adam Bobola
- ☐ Craig Salyers
- ☐ Jim Dennig
- ☐ Bob Motzny
- ☐ Cindy Barber / Sue Knowlton
- ☐ Abbie Huber
- ☐ Paul Case, VP Client Success
- ☐ Eric Burnson
- ☐ Jim Wisor
- ☐ Kathleen McIntire
- ☐ Lisa Verbeeren
- ☐ Kristy Kaer

## ACCOUNTING / DISTRIBUTION

- ☐ Dean Chmiel
- ☐ Chuck Twigg
- ☐ Dennis Kleinedler
- ☐ Jennifer Korsak
- ☐ Ling Xiao Sun
- ☐ Steve McDonald

## SALES / SALES OPERATIONS

- ☐ Craig Nelson, VP Sales
- ☐ Mark Dvorak, Installed Sales
- ☐ John Wright
- ☐ Lori English
- ☐ Scott Bitoff / Adam Boyd
- ☐ Kathy Fant
- ☐ Mike McKee
- ☐ Sales Director    **Neal**
- ☐ Account Exec    **Miller**
- ☐ Client Executive    _____

## OTHERS / SOFTCODE / BRAZOS / SOCRATA

- ☐ Brazos Distribution
- ☐ SoftCode Distribution
- ☐ Socrata Distribution
- ☐ SceneDoc Distribution
- ☐ _____
- ☐ _____
- ☐ _____

## ORIGINALS

**Date Returned:** **12-16-20**

**Returned by:** **T. Miller**

---

**Contract considered a:**      New Sale      Upgrade Sale



## LICENSE AND SERVICES AGREEMENT

This License and Services Agreement is made between Tyler Technologies, Inc. and Client.

WHEREAS, Client selected Tyler to license the software products and perform the services set forth in the Investment Summary and Tyler desires to perform such actions under the terms of this Agreement;

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants and promises set forth in this Agreement, Tyler and Client agree as follows:

### SECTION A – DEFINITIONS

- **"Affiliated Organization"** means a government entity separate from you, but which will have access to the Tyler Software detailed in <u>Exhibit A</u> and licensed to you under this Agreement. Permissible Affiliated Organizations are listed in <u>Exhibit A</u>. Your authorized representative may request additional government entities be added as Affiliated Organizations at any time by providing written notice to us. An authorized representative is a person with the authority to bind you contractually. Section I(15) notwithstanding, notice of this request may be by email to your Tyler account representative. Upon our written acceptance of your request, the proposed government entity will become an Affiliated Organization under this Agreement.
- **"Agreement"** means this License and Services Agreement.
- **"Business Travel Policy"** means our business travel policy. A copy of our current Business Travel Policy is attached as <u>Schedule 1</u> to <u>Exhibit B</u>.
- **"Client"** means **Genesee County 911**.
- **"Defect"** means a failure of the Tyler Software to substantially conform to the functional descriptions set forth in our written proposal to you, or their functional equivalent. Future functionality may be updated, modified, or otherwise enhanced through our maintenance and support services, and the governing functional descriptions for such future functionality will be set forth in our then-current Documentation.
- **"Developer"** means a third party who owns the intellectual property rights to Third Party Software.
- **"Documentation"** means any online or written documentation related to the use or functionality of the Tyler Software that we provide or otherwise make available to you, including instructions, user guides, manuals and other training or self-help documentation.
- **"Effective Date"** means the date on which your authorized representative signs the Agreement.
- **"Force Majeure"** means an event beyond the reasonable control of you or us, including, without limitation, governmental action, war, riot or civil commotion, fire, natural disaster, or any other cause that could not with reasonable diligence be foreseen or prevented by you or us.
- **"Investment Summary"** means the agreed upon cost proposal for the software, products, and services attached as <u>Exhibit A</u>.
- **"Invoicing and Payment Policy"** means the invoicing and payment policy. A copy of our current Invoicing and Payment Policy is attached as <u>Exhibit B</u>.
- **"Maintenance and Support Agreement"** means the terms and conditions governing the provision of maintenance and support services to all of our customers. A copy of our current Maintenance and



1

Support Agreement is attached as <u>Exhibit C</u>.

- **"Support Call Process"** means the support call process applicable to all of our customers who have licensed the Tyler Software. A copy of our current Support Call Process is attached as <u>Schedule 1</u> to <u>Exhibit C</u>.
- **"Third Party Terms"** means, if any, the end user license agreement(s) or similar terms for the Third Party Software, as applicable and attached as <u>Exhibit D</u>.
- **"Third Party Hardware"** means the third party hardware, if any, identified in the Investment Summary.
- **"Third Party Products"** means the Third Party Software and Third Party Hardware.
- **"Third Party Software"** means the third party software, if any, identified in the Investment Summary.
- **"Third Party Services"** means the third party services, if any, identified in the Investment Summary.
- **"Tyler"** means Tyler Technologies, Inc., a Delaware corporation, as successor-in-interest to New World Systems.
- **"Tyler Software"** means our proprietary software, including any integrations, custom modifications, and/or other related interfaces identified in the Investment Summary and licensed by us to you through this Agreement.
- **"we", "us", "our"** and similar terms mean Tyler.
- **"you"** and similar terms mean Client.

## SECTION B – SOFTWARE LICENSE

1. <u>License Grant and Restrictions</u>.

   1.1 We grant to you a license to use the Tyler Software for your internal business purposes only, in the scope of the internal business purposes disclosed to us as of the Effective Date. You may make copies of the Tyler Software for backup and testing purposes, so long as such copies are not used in production and the testing is for internal use only. Your rights to use the Tyler Software are perpetual but may be revoked if you do not comply with the terms of this Agreement.

   1.2 The Documentation is licensed to you and may be used and copied by your employees for internal, non-commercial reference purposes only.

   1.3 You may not: (a) transfer or assign the Tyler Software to a third party; (b) reverse engineer, decompile, or disassemble the Tyler Software; (c) rent, lease, lend, or provide commercial hosting services with the Tyler Software; or (d) publish or otherwise disclose the Tyler Software or Documentation to third parties.

   1.4 The license terms in this Agreement apply to updates and enhancements we may provide to you or make available to you through your Maintenance and Support Agreement.

   1.5 The right to transfer the Tyler Software to a replacement hardware system is included in your license. You will give us advance written notice of any such transfer and will pay us for any required or requested technical assistance from us associated with such transfer.

   1.6 We reserve all rights not expressly granted to you in this Agreement. The Tyler Software and Documentation are protected by copyright and other intellectual property laws and treaties. We own the title, copyright, and other intellectual property rights in the Tyler Software and the Documentation. **The Tyler Software is licensed, not sold.**



2.  <u>License Fees</u>.  You agree to pay us the license fees in the amounts set forth in the Investment Summary. Those amounts are payable in accordance with our Invoicing and Payment Policy.

3.  <u>Escrow</u>.  We maintain an escrow agreement with a third party under which we place the source code for each major release of the Tyler Software.  You may be added as a beneficiary to the escrow agreement by completing a standard beneficiary enrollment form and paying the annual beneficiary fee set forth in the Investment Summary.  You will be responsible for maintaining your ongoing status as a beneficiary, including payment of the then-current annual beneficiary fees.  Release of source code for the Tyler Software is strictly governed by the terms of the escrow agreement.

4.  <u>Limited Warranty</u>.  We warrant that the Tyler Software will be without Defect(s) as long as you have a Maintenance and Support Agreement in effect.  If the Tyler Software does not perform as warranted, we will use all reasonable efforts, consistent with industry standards, to cure the Defect as set forth in the Maintenance and Support Agreement.

5.  <u>Affiliated Organizations for the Tyler Software</u>.

    5.1 <u>Access by Affiliated Organizations</u>. We will permit you to grant each Affiliated Organization access to the Tyler Software hosted from your servers. You understand and agree that you are solely responsible for making the Tyler Software available to any Affiliated Organizations, and that we do not warrant, and are not responsible for, the performance of your servers or any Affiliated Organization's access thereto.

    5.2 <u>Application of this Agreement</u>. Each Affiliated Organization must abide by the terms and conditions of this Agreement, and you are responsible for any breach hereof by an Affiliated Organization accessing the Tyler Software hosted from your servers.

    5.3 <u>Termination of Access of an Affiliated Organization</u>. You agree to deny an Affiliated Organization's access to the Tyler Software upon written notice from us that the applicable Affiliated Organization has violated the terms of this Agreement.

**SECTION C – PROFESSIONAL SERVICES**

1.  <u>Services</u>.  We will provide you the various implementation-related services itemized in the Investment Summary.

2.  <u>Professional Services Fees</u>.  You agree to pay us the professional services fees in the amounts set forth in the Investment Summary.  Those amounts are payable in accordance with our Invoicing and Payment Policy. You acknowledge that the fees stated in the Investment Summary are good-faith estimates of the amount of time and materials required for your implementation.  We will bill you the actual fees incurred based on the in-scope services provided to you.  Any discrepancies in the total values set forth in the Investment Summary will be resolved by multiplying the applicable hourly rate by the quoted hours.

3.  <u>Additional Services</u>.  The Investment Summary contains the scope of services and related costs (including programming and/or interface estimates) required for the project based on our understanding of the specifications you supplied.  If additional work is required, or if you use or request additional services, we will provide you with an addendum or change order, as applicable, outlining the costs for the additional work.  The price quotes in the addendum or change order will be valid for thirty (30) days from the date of the quote.



4.  Cancellation. We make all reasonable efforts to schedule our personnel for travel, including arranging travel reservations, at least two (2) weeks in advance of commitments. Therefore, if you cancel services less than two (2) weeks in advance (other than for Force Majeure or breach by us), you will be liable for all (a) non-refundable expenses incurred by us on your behalf, and (b) daily fees associated with cancelled professional services if we are unable to reassign our personnel. We will make all reasonable efforts to reassign personnel in the event you cancel within two (2) weeks of scheduled commitments.

5.  Services Warranty. We will perform the services in a professional, workmanlike manner, consistent with industry standards. In the event we provide services that do not conform to this warranty, we will re-perform such services at no additional cost to you.

6.  Site Access and Requirements. At no cost to us, you agree to provide us with full and free access to your personnel, facilities, and equipment as may be reasonably necessary for us to provide implementation services, subject to any reasonable security protocols or other written policies provided to us as of the Effective Date, and thereafter as mutually agreed to by you and us. You further agree to provide a reasonably suitable environment, location, and space for the installation of the Tyler Software and any Third Party Products, including, without limitation, sufficient electrical circuits, cables, and other reasonably necessary items required for the installation and operation of the Tyler Software and any Third Party Products.

7.  Client Assistance. You acknowledge that the implementation of the Tyler Software is a cooperative process requiring the time and resources of your personnel. You agree to use all reasonable efforts to cooperate with and assist us as may be reasonably required to meet the agreed upon project deadlines and other milestones for implementation. This cooperation includes at least working with us to schedule the implementation-related services outlined in this Agreement. We will not be liable for failure to meet any deadlines and milestones when such failure is due to Force Majeure or to the failure by your personnel to provide such cooperation and assistance (either through action or omission).

## SECTION D – MAINTENANCE AND SUPPORT

This Agreement includes the period of free maintenance and support services identified in the Invoicing and Payment Policy. If you have purchased ongoing maintenance and support services, and continue to make timely payments for them according to our Invoicing and Payment Policy, we will provide you with maintenance and support services for the Tyler Software under the terms of our standard Maintenance and Support Agreement.

## SECTION E – THIRD PARTY PRODUCTS

To the extent there are any Third Party Products set forth in the Investment Summary, the following terms and conditions will apply:

1.  Third Party Hardware. We will sell, deliver, and install onsite the Third Party Hardware, if you have purchased any, for the price set forth in the Investment Summary. Those amounts are payable in accordance with our Invoicing and Payment Policy.

2.  Third Party Software. Upon payment in full of the Third Party Software license fees, you will receive a non-transferable license to use the Third Party Software and related documentation for your internal business



4

purposes only. Your license rights to the Third Party Software will be governed by the Third Party Terms.

2.1 We will install onsite the Third Party Software. The installation cost is included in the installation fee in the Investment Summary.

2.2 If the Developer charges a fee for future updates, releases, or other enhancements to the Third Party Software, you will be required to pay such additional future fee.

2.3 The right to transfer the Third Party Software to a replacement hardware system is governed by the Developer. You will give us advance written notice of any such transfer and will pay us for any required or requested technical assistance from us associated with such transfer.

3. <u>Third Party Products Warranties</u>.

3.1 We are authorized by each Developer to grant or transfer the licenses to the Third Party Software.

3.2 The Third Party Hardware will be new and unused, and upon payment in full, you will receive free and clear title to the Third Party Hardware.

3.3 You acknowledge that we are not the manufacturer of the Third Party Products. We do not warrant or guarantee the performance of the Third Party Products. However, we grant and pass through to you any warranty that we may receive from the Developer or supplier of the Third Party Products.

4. <u>Third Party Services</u>. If you have purchased Third Party Services, those services will be provided independent of Tyler by such third-party at the rates set forth in the Investment Summary and in accordance with our Invoicing and Payment Policy.

5. <u>Maintenance</u>. If you have a Maintenance and Support Agreement in effect, you may report defects and other issues related to the Third Party Software directly to us, and we will (a) directly address the defect or issue, to the extent it relates to our interface with the Third Party Software; and/or (b) facilitate resolution with the Developer, unless that Developer requires that you have a separate, direct maintenance agreement in effect with that Developer. In all events, if you do not have a Maintenance and Support Agreement in effect with us, you will be responsible for resolving defects and other issues related to the Third Party Software directly with the Developer.

## SECTION F – INVOICING AND PAYMENT; INVOICE DISPUTES

1. <u>Invoicing and Payment</u>. We will invoice you for all fees set forth in the Investment Summary per our Invoicing and Payment Policy, subject to Section F(2).

2. <u>Invoice Disputes</u>. If you believe any delivered software or service does not conform to the warranties in this Agreement, you will provide us with written notice within thirty (30) days of your receipt of the applicable invoice. The written notice must contain reasonable detail of the issues you contend are in dispute so that we can confirm the issue and respond to your notice with either a justification of the invoice, an adjustment to the invoice, or a proposal addressing the issues presented in your notice. We will work with you as may be necessary to develop an action plan that outlines reasonable steps to be taken by each of us to resolve any issues presented in your notice. You may withhold payment of the amount(s) actually in dispute, and only those amounts, until we complete the action items outlined in the plan. If we are unable to complete the action items outlined in the action plan because of your failure to complete the items agreed to be done



by you, then you will remit full payment of the invoice. We reserve the right to suspend delivery of all services, including maintenance and support services, if you fail to pay an invoice not disputed as described above within thirty (30) days of notice of our intent to do so.

## SECTION G – TERMINATION

1. <u>For Cause</u>. If you believe we have materially breached this Agreement, you will invoke the Dispute Resolution clause set forth in Section I(3). You may terminate this Agreement for cause in the event we do not cure, or create a mutually agreeable action plan to address, a material breach of this Agreement within the thirty (30) day window set forth in Section I(3). In the event of termination for cause, you will pay us for all undisputed fees and expenses related to the software, products, and/or services you have received, or we have incurred or delivered, prior to the effective date of termination.

2. <u>Lack of Appropriations</u>. If you should not appropriate or otherwise receive funds sufficient to purchase, lease, operate, or maintain the software or services set forth in this Agreement, you may unilaterally terminate this Agreement effective on the final day of the fiscal year through which you have funding. You will make every effort to give us at least thirty (30) days written notice prior to a termination for lack of appropriations. In the event of termination due to a lack of appropriations, you will pay us for all undisputed fees and expenses related to the software and/or services you have received, or we have incurred or delivered, prior to the effective date of termination. Any disputed fees and expenses must have been submitted to the Invoice Dispute process set forth in Section F(2) at the time of termination in order to be withheld at termination. You will not be entitled to a refund or offset of previously paid license and other fees.

3. <u>Force Majeure</u>. Neither party will be liable, you or we may terminate this Agreement if a Force Majeure event suspends performance of scheduled tasks for a period of forty-five (45) days or more. In the event of termination due to Force Majeure, you will pay us for all undisputed fees and expenses related to the software and/or services you have received, or we have incurred or delivered, prior to the effective date of termination. Any disputed fees and expenses must have been submitted to the Invoice Dispute process set forth in Section F(2) at the time of termination in order to be withheld at termination. You will not be entitled to a refund or offset of previously paid license and other fees.

## SECTION H – INDEMNIFICATION, LIMITATION OF LIABILITY AND INSURANCE

1. <u>Intellectual Property Infringement Indemnification</u>.

    1.1 We will defend you against any third party claim(s) that the Tyler Software or Documentation infringes that third party's patent, copyright, or trademark, or misappropriates its trade secrets, and will pay the amount of any resulting adverse final judgment (or settlement to which we consent). You must notify us promptly in writing of the claim and give us sole control over its defense or settlement. You agree to provide us with reasonable assistance, cooperation, and information in defending the claim at our expense.

    1.2 Our obligations under this Section H(1) will not apply to the extent the claim or adverse final judgment is based on your: (a) use of a previous version of the Tyler Software and the claim would have been avoided had you installed and used the current version of the Tyler Software, and we provided notice of that requirement to you; (b) combining the Tyler Software with any product or device not provided, contemplated, or approved by us; (c) altering or modifying the Tyler Software, including any

6



modification by third parties at your direction or otherwise permitted by you; (d) use of the Tyler Software in contradiction of this Agreement, including with non-licensed third parties; or (e) willful infringement, including use of the Tyler Software after we notify you to discontinue use due to such a claim.

1.3 If we receive information concerning an infringement or misappropriation claim related to the Tyler Software, we may, at our expense and without obligation to do so, either: (a) procure for you the right to continue its use; (b) modify it to make it non-infringing; or (c) replace it with a functional equivalent, in which case you will stop running the allegedly infringing Tyler Software immediately. Alternatively, we may decide to litigate the claim to judgment, in which case you may continue to use the Tyler Software consistent with the terms of this Agreement.

1.4 If an infringement or misappropriation claim is fully litigated and your use of the Tyler Software is enjoined by a court of competent jurisdiction, in addition to paying any adverse final judgment (or settlement to which we consent), we will, at our option, either: (a) procure the right to continue its use; (b) modify it to make it non-infringing; (c) replace it with a functional equivalent; or (d) terminate your license and refund the license fees paid for the infringing Tyler Software, as depreciated on a straight-line basis measured over seven (7) years from the Effective Date. We will pursue those options in the order listed herein. This section provides your exclusive remedy for third party copyright, patent, or trademark infringement and trade secret misappropriation claims.

2. General Indemnification.

2.1 We will indemnify and hold harmless you and your agents, officials, and employees from and against any and all third-party claims, losses, liabilities, damages, costs, and expenses (including reasonable attorney's fees and costs) for (a) personal injury or property damage to the extent caused by our negligence or willful misconduct; or (b) our violation of a law applicable to our performance under this Agreement. You must notify us promptly in writing of the claim and give us sole control over its defense or settlement. You agree to provide us with reasonable assistance, cooperation, and information in defending the claim at our expense.

2.2 To the extent permitted by applicable law, you will indemnify and hold harmless us and our agents, officials, and employees from and against any and all third-party claims, losses, liabilities, damages, costs, and expenses (including reasonable attorney's fees and costs) for (a) personal injury or property damage to the extent caused by your negligence or willful misconduct; or (b) your violation of a law applicable to your performance under this Agreement. We will notify you promptly in writing of the claim and will give you sole control over its defense or settlement. We agree to provide you with reasonable assistance, cooperation, and information in defending the claim at your expense.

3. **DISCLAIMER. EXCEPT FOR THE EXPRESS WARRANTIES PROVIDED IN THIS AGREEMENT AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WE HEREBY DISCLAIM ALL OTHER WARRANTIES AND CONDITIONS, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES, DUTIES, OR CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

4. **LIMITATION OF LIABILITY. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, OUR LIABILITY FOR DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER BASED ON A THEORY OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, SHALL BE LIMITED TO YOUR ACTUAL DIRECT DAMAGES, NOT TO EXCEED (A) PRIOR TO FORMAL TRANSITION TO MAINTENANCE AND SUPPORT,**

tyler

**THE TOTAL ONE-TIME FEES SET FORTH IN THE INVESTMENT SUMMARY; OR (B) AFTER FORMAL TRANSITION TO MAINTENANCE AND SUPPORT, THE THEN-CURRENT ANNUAL MAINTENANCE AND SUPPORT FEE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE PRICES SET FORTH IN THIS AGREEMENT ARE SET IN RELIANCE UPON THIS LIMITATION OF LIABILITY AND TO THE MAXIMUM EXTENT ALLOWED UNDER APPLICABLE LAW, THE EXCLUSION OF CERTAIN DAMAGES, AND EACH SHALL APPLY REGARDLESS OF THE FAILURE OF AN ESSENTIAL PURPOSE OF ANY REMEDY. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO CLAIMS THAT ARE SUBJECT TO SECTIONS H(1) AND H(2).**

5. **EXCLUSION OF CERTAIN DAMAGES. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL WE BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

6. <u>Insurance</u>. During the course of performing services under this Agreement, we agree to maintain the following levels of insurance: (a) Commercial General Liability of at least $1,000,000; (b) Automobile Liability of at least $1,000,000; (c) Professional Liability of at least $1,000,000; (d) Workers Compensation complying with applicable statutory requirements; and (e) Excess/Umbrella Liability of at least $5,000,000. We will add you as an additional insured to our Commercial General Liability and Automobile Liability policies, which will automatically add you as an additional insured to our Excess/Umbrella Liability policy as well. We will provide you with copies of certificates of insurance upon your written request.

## SECTION I – GENERAL TERMS AND CONDITIONS

1. <u>Additional Products and Services</u>. You may purchase additional products and services at the rates set forth in the Investment Summary for twelve (12) months from the Effective Date, and thereafter at our then-current list price, by executing a mutually agreed addendum. If no rate is provided in the Investment Summary, or those twelve (12) months have expired, you may purchase additional products and services at our then-current list price, also by executing a mutually agreed addendum. The terms of this Agreement will control any such additional purchase(s), unless otherwise specifically provided in the addendum.

2. <u>Optional Items</u>. Pricing for any listed optional products and services in the Investment Summary will be valid for twelve (12) months from the Effective Date.

3. <u>Dispute Resolution</u>. You agree to provide us with written notice within thirty (30) days of becoming aware of a dispute. You agree to cooperate with us in trying to reasonably resolve all disputes, including, if requested by either party, appointing a senior representative to meet and engage in good faith negotiations with our appointed senior representative. Senior representatives will convene within thirty (30) days of the written dispute notice, unless otherwise agreed. All meetings and discussions between senior representatives will be deemed confidential settlement discussions not subject to disclosure under Federal Rule of Evidence 408 or any similar applicable State of Michigan rule. If we fail to resolve the dispute, then the parties shall participate in non-binding mediation in an effort to resolve the dispute. If the dispute remains unresolved after mediation, then either of us may assert our respective rights and remedies in a court of competent jurisdiction within the State of Michigan. Nothing in this section shall prevent you or us from seeking necessary injunctive relief during the dispute resolution procedures.

4. <u>Taxes</u>. The fees in the Investment Summary do not include any taxes, including, without limitation, sales, use, or excise tax. If you are a tax-exempt entity, you agree to provide us with a tax-exempt certificate. Otherwise, we will pay all applicable taxes to the proper authorities and you will reimburse us for such taxes. If you have a valid direct-pay permit, you agree to provide us with a copy. For clarity, we are responsible for

8



paying our income taxes, both federal and state, as applicable, arising from our performance of this Agreement.

5. Nondiscrimination. We will not discriminate against any person employed or applying for employment concerning the performance of our responsibilities under this Agreement. This discrimination prohibition will apply to all matters of initial employment, tenure, and terms of employment, or otherwise with respect to any matter directly or indirectly relating to employment concerning race, color, religion, national origin, age, sex, sexual orientation, ancestry, disability that is unrelated to the individual's ability to perform the duties of a particular job or position, height, weight, marital status, or political affiliation. We will post, where appropriate, all notices related to nondiscrimination as may be required by applicable law.

6. E-Verify. We have complied, and will comply, with the E-Verify procedures administered by the U.S. Citizenship and Immigration Services Verification Division for all of our employees assigned to your project.

7. Subcontractors. We will not subcontract any services under this Agreement without your prior written consent, not to be unreasonably withheld.

8. Binding Effect; No Assignment. This Agreement shall be binding on, and shall be for the benefit of, either your or our successor(s) or permitted assign(s). Neither party may assign this Agreement without the prior written consent of the other party; provided, however, your consent is not required for an assignment by us as a result of a corporate reorganization, merger, acquisition, or purchase of substantially all of our assets.

9. Force Majeure. Except for your payment obligations, neither party will be liable for delays in performing its obligations under this Agreement to the extent that the delay is caused by Force Majeure; provided, however, that within ten (10) business days of the Force Majeure event, the party whose performance is delayed provides the other party with written notice explaining the cause and extent thereof, as well as a request for a reasonable time extension equal to the estimated duration of the Force Majeure event.

10. No Intended Third Party Beneficiaries. This Agreement is entered into solely for the benefit of you and us. No third party will be deemed a beneficiary of this Agreement, and no third party will have the right to make any claim or assert any right under this Agreement. This provision does not affect the rights of third parties under any Third Party Terms.

11. Entire Agreement; Amendment. This Agreement represents the entire agreement between you and us with respect to the subject matter hereof, and supersedes any prior agreements, understandings, and representations, whether written, oral, expressed, implied, or statutory. Purchase orders submitted by you, if any, are for your internal administrative purposes only, and the terms and conditions contained in those purchase orders will have no force or effect. This Agreement may only be modified by a written amendment signed by an authorized representative of each party.

12. Severability. If any term or provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement will be considered valid and enforceable to the fullest extent permitted by law.

13. No Waiver. In the event that the terms and conditions of this Agreement are not strictly enforced by either party, such non-enforcement will not act as or be deemed to act as a waiver or modification of this Agreement, nor will such non-enforcement prevent such party from enforcing each and every term of this Agreement thereafter.

14. Independent Contractor. We are an independent contractor for all purposes, including but not limited to



the federal Internal Revenue Code and Michigan Workers' Disability Compensation act, under this Agreement.

15. <u>Notices</u>. All notices or communications required or permitted as a part of this Agreement, such as notice of an alleged material breach for a termination for cause or a dispute that must be submitted to dispute resolution, must be in writing and will be deemed delivered upon the earlier of the following: (a) actual receipt by the receiving party; (b) upon receipt by sender of a certified mail, return receipt signed by an employee or agent of the receiving party; (c) upon receipt by sender of proof of email delivery; or (d) if not actually received, five (5) days after deposit with the United States Postal Service authorized mail center with proper postage (certified mail, return receipt requested) affixed and addressed to the other party at the address set forth on the signature page hereto or such other address as the party may have designated by proper notice. The consequences for the failure to receive a notice due to improper notification by the intended receiving party of a change in address will be borne by the intended receiving party.

16. <u>Client Lists</u>. You agree that we may identify you by name in client lists, marketing presentations, and promotional materials.

17. <u>Confidentiality</u>. Both parties recognize that their respective employees and agents, in the course of performance of this Agreement, may be exposed to confidential information and that disclosure of such information could violate rights to private individuals and entities, including the parties. Confidential information is nonpublic information that a reasonable person would believe to be confidential and includes, without limitation, personal identifying information (*e.g.*, social security numbers) and trade secrets, each as defined by applicable Michigan law. Each party agrees that it will not disclose any confidential information of the other party and further agrees to take all reasonable and appropriate action to prevent such disclosure by its employees or agents. The confidentiality covenants contained herein will survive the termination or cancellation of this Agreement. This obligation of confidentiality will not apply to information that:

    (a) is in the public domain, either at the time of disclosure or afterwards, except by breach of this Agreement by a party or its employees or agents;

    (b) a party can establish by reasonable proof was in that party's possession at the time of initial disclosure;

    (c) a party receives from a third party who has a right to disclose it to the receiving party; or

    (d) is the subject of a legitimate disclosure request under the open records laws or similar applicable public disclosure laws governing this Agreement; provided, however, that in the event you receive an open records or other similar applicable request, you will give us prompt notice and otherwise perform the functions required by applicable law.

18. <u>Business License</u>. In the event a local business license is required for us to perform services hereunder, you will promptly notify us and provide us with the necessary paperwork and/or contact information so that we may timely obtain such license.

19. <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of Michigan, without regard to its rules on conflicts of law.

20. <u>Multiple Originals and Authorized Signatures</u>. This Agreement may be executed in multiple originals, any of which will be independently treated as an original document. Any electronic, faxed, scanned, photocopied, or similarly reproduced signature on this Agreement or any amendment hereto will be deemed an original signature and will be fully enforceable as if an original signature. Each party represents to the other that the



signatory set forth below is duly authorized to bind that party to this Agreement.

21. <u>Cooperative Procurement</u>.  To the maximum extent permitted by applicable law, we agree that this Agreement may be used as a cooperative procurement vehicle by eligible jurisdictions.  We reserve the right to negotiate and customize the terms and conditions set forth herein, including but not limited to pricing, to the scope and circumstances of that cooperative procurement.

22. <u>Socrata Terms and Conditions</u>. Tyler and Client agree to perform and be bound by all covenants, terms, and conditions of the Socrata Terms and Conditions, which are attached hereto as Exhibit F ("Socrata Agreement") with respect to the Socrata Law Enforcement Analytics software as more particularly described in Exhibit A attached hereto, and all such covenants, terms, and conditions are incorporated by reference as if set forth at length herein. If the Agreement terminates, so does Client's access to the Socrata Law Enforcement Analytics software.

23. You retain all ownership and intellectual property rights to your data.

24. <u>Contract Documents</u>.  This Agreement includes the following exhibits:

| | |
|---|---|
| Exhibit A | Investment Summary |
| Exhibit B | Invoicing and Payment Policy |
| | Schedule 1: Business Travel Policy |
| Exhibit C | Maintenance and Support Agreement |
| | Schedule 1: Support Call Process |
| Exhibit D | Third Party End User License Agreement(s) |
| | Schedule 1: Implementation and Training Support Services |
| Exhibit E | Additional Terms for New World Public Safety and Brazos Hosted Components |
| | Schedule 1: Service Level Agreement for Hosted Components |
| Exhibit F | Socrata Terms and Conditions |

[SIGNATURE PAGE FOLLOWS]



DocuSign Envelope ID: 21A04323-1119-4500-B42A-A44EA15047F0

IN WITNESS WHEREOF, a duly authorized representative of each party has executed this Agreement as of the date(s) set forth below.

Tyler Technologies, Inc.

By: _Bryan Proctor (Dec 15, 2020 19:17 EST)_____

Name: __Bryan Proctor_____

Title: ___President, Public Safety Division_____

Date: ___December 15, 2020_____

Address for Notices:
    Tyler Technologies, Inc.
    One Tyler Drive
    Yarmouth, ME 04096
    Attention: Chief Legal Officer

Genesee County 911

By: _____

Name: _Spring Tremaine_____

Title: ___Director_____

Date: __12/14/2020_____

By: _____

Name: _Mark Emmendorfer_____

Title: ___Chairman_____

Date: __12-14-2020_____

By: _____

Name: _Scott Bennett_____

Title: ___Secretary/Treasurer_____

Date: __12/14/20_____

Address for Notices:
    Genesee County 911
    4481 Corunna Rd.
    Flint, MI 48532-4320
    Attention: ACCT MGR

As to Form DocuSigned by:

By: _____
    21ECD53852904CA...
    Anthony Chubb, Consortium Attorney

❖❖ tyler

12



## Exhibit A
## Investment Summary

The following Investment Summary details the software, products, and services to be delivered by us to you under the Agreement.  This Investment Summary is effective as of the Effective Date.  Capitalized terms not otherwise defined will have the meaning assigned to such terms in the Agreement.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK





**new world**

a tyler public safety solution

**Sales Quotation For**

Genesee County 911
4481 Corunna Rd
Flint, MI 48532-4320
Phone: +1 (810) 732-4720

| | | | |
|---|---|---|---|
| Quoted By: | Tom Miller | | |
| Date: | 11/30/2020 | | |
| Quote Expiration: | 12/18/2020 | | |
| Quote Name: | Genesee County, MI CAD LERMS | | |
| Quote Number: | 2019-29221-8 | | |
| Quote Description: | Integrated Solution | | |

**Tyler Software**

| Description | License | Discount | License Total | Year One Maintenance |
|---|---|---|---|---|
| **Computer Aided Dispatch** | | | | |
| New World Enterprise Combined LE/Fire/EMS CAD | $330,350 | $0 | $330,350 | $20,864 |
| BOLOs | $22,000 | $11,000 | $11,000 | $2,310 |
| CAD AVL | $22,000 | $11,000 | $11,000 | $2,310 |
| Service Vehicle Rotation (Wrecker, Ambulance) | $22,000 | $11,000 | $11,000 | $2,310 |
| Web CAD Monitor | $50,000 | $25,000 | $25,000 | $5,250 |
| CAD to CAD Interface | $30,000 | $15,000 | $15,000 | $3,150 |
| CAD Paging Interface | $22,000 | $11,000 | $11,000 | $2,310 |
| E-911 Interface | $22,000 | $11,000 | $11,000 | $2,310 |
| CAD NCIC Interface | $57,000 | $28,500 | $28,500 | $5,985 |
| Pictometry Interface | $22,000 | $11,000 | $11,000 | $2,310 |
| ASAP Interface | $30,000 | $15,000 | $15,000 | $3,150 |
| Encoder Interface | $22,000 | $11,000 | $11,000 | $2,310 |
| Fire Records Interface | $44,000 | $22,000 | $22,000 | $4,620 |
| **Law Enforcement Records Management System** | | | | |
| New World Enterprise Law Enforcement Records | $240,000 | $240,000 | $0 | $25,200 |
| Case Management | | | | |
| Dynamic Reporting | | | | |
| Field Interviews | | | | |
| Impounded Vehicles | | | | |
| Investigations | | | | |
| Orders of Protection | | | | |

**CONFIDENTIAL**

1 of 7

2019-29221-8 - Integrated Solution

| Item | | | | |
|---|---|---|---|---|
| Registered Offenders | | | | |
| Training | | | | |
| Wants and Warrants | | | | |
| Bookings | $5,500 | $5,500 | $0 | $1,155 |
| Crash | $5,500 | $5,500 | $0 | $578 |
| Equipment and Inventory | $11,000 | $11,000 | $0 | $1,155 |
| Gangs | $5,500 | $5,500 | $0 | $1,155 |
| Narcotics | $5,500 | $5,500 | $0 | $1,155 |
| Pawn Shops | $4,500 | $4,500 | $0 | $473 |
| Permits | $5,500 | $5,500 | $0 | $1,155 |
| Tyler Content Manager (TCM) | $44,000 | $44,000 | $0 | $4,620 |
| Livescan Interface (LERMS) | $22,000 | $22,000 | $0 | $4,620 |
| Ticket Writer Interface (Supports Brazos) | $0 | $0 | $0 | $0 |
| Citizen Reporting Interface | $30,000 | $30,000 | $0 | $6,300 |
| NCIC Interface | $100,000 | $100,000 | $0 | $10,500 |
| **Mobile** | | | | |
| New World Mobile Server | $257,000 | $257,000 | $0 | $12,075 |
| LE Field Reporting (Federal Standard) ( 184 ) | $73,600 | $73,600 | $73,600 | $7,728 |
| LE Accident Field Reporting (1 form) ( 184 ) | $55,200 | $55,200 | $55,200 | $5,796 |
| MCT Ticket Writer Interface (supports Brazos) ( 184 ) | $0 | $0 | $0 | $0 |
| Law Enforcement Mobile Site License | $268,209 | $134,105 | $134,104 | $28,162 |
| ShieldForce LE Dispatch with Advanced Mapping | $0 | $0 | $0 | $0 |
| LE Dispatch/Messaging/State/NCIC | $0 | $0 | $0 | $0 |
| Drivers License Mag Stripe Reader/Barcode Reader Interface | $0 | $0 | $0 | $0 |
| Mugshot Image Download | $0 | $0 | $0 | $0 |
| State Photo Download | $0 | $0 | $0 | $0 |
| In-Car Mapping / AVL | $0 | $0 | $0 | $0 |
| In-Car Routing | $0 | $0 | $0 | $0 |
| Fire/EMS Mobile Site License | $60,088 | $30,044 | $30,044 | $6,309 |
| CrewForce – Fire Dispatch | $0 | $0 | $0 | $0 |
| Fire Dispatch/Messaging | $0 | $0 | $0 | $0 |
| Fire In-Car Mapping / AVL | $0 | $0 | $0 | $0 |
| Fire In-Car Routing | $0 | $0 | $0 | $0 |
| **[…]r Software** | | | | |
| CAD Data Mart / Includes 2 users | $10,000 | $5,000 | $5,000 | $1,050 |
| CAD Dashboards | $36,000 | $18,000 | $18,000 | $3,780 |
| Law Enforcement Records Management Data Mart / Includes 2 users | $10,000 | $10,000 | $0 | $1,050 |
| Workstation License | $248,500 | $248,500 | $248,500 | $0 |

## Brazos

| Description | | | | Annual |
|---|---|---|---|---|
| Device Level Interface: New World Mobile | | $0 | | $0 |
| Interface: New World Records Mgmt System | | $0 | | $0 |
| Brazos Site License | | $109,200 | $109,200 | $22,962 |
| CMS Interface Site License - JIS | | $49,400 | $49,400 | $10,374 |
| Sub-Total: | $2,351,547 | $1,146,049 | $1,205,498 | $216,541 |
| Less Discount: | $1,146,049 | | | |
| Flint Customer Discount: | $177,500 | $177,500 | | $216,541 |
| TOTAL: | $1,027,998 | $1,027,998 | | $0 |

## Annual/SaaS

| Description | Quantity | Fee | Discount | Annual |
|---|---|---|---|---|
| Socrata Law Enforcement Analytics (includes Crime Trending, Geo-Analytics and Citizen Connect) | 1 | $40,000 | $0 | $40,000 |
| Mobility Hosting Annual Fee | 1 | $3,000 | $0 | $3,000 |
| Brazos Hosting Fee | 1 | $11,102 | $0 | $11,102 |
| TOTAL: | | | | $54,102 |

## Services

| Description | Quantity | Unit Price | Discount | Total |
|---|---|---|---|---|
| Project Management | 1 | $65,760 | $0 | $65,760 |
| High Availability System Assurance and Software Installation (2 environments) | 1 | $20,880 | $0 | $20,880 |
| Mobility Implementation | 1 | $2,320 | $0 | $2,320 |
| IiS Implementation | 1 | $22,620 | $0 | $22,620 |
| ICIC Installation | 1 | $21,025 | $0 | $21,025 |
| Decision Support Software Implementation | 1 | $4,350 | $0 | $4,350 |
| Web CAD Monitor Installation | 1 | $1,160 | $0 | $1,160 |
| CAD to CAD Interface Installation | 1 | $5,800 | $0 | $5,800 |
| CAD Paging Interface Installation | 1 | $1,160 | $0 | $1,160 |
| E-911 Interface Installation | 1 | $1,160 | $0 | $1,160 |
| Dictometry Interface Installation | 1 | $580 | $0 | $580 |
| SAP Interface Installation | 1 | $5,800 | $0 | $5,800 |
| Encoder Interface Installation | 1 | $3,480 | $0 | $3,480 |
| Fire Records Interface Installation | 1 | $2,320 | $0 | $2,320 |
| Combined or Fire/EMS CAD Configuration | 1 | $21,750 | $0 | $21,750 |
| CAD Training (10 users ea.) | 5 | $4,350 | $0 | $21,750 |
| CAD Go-Live | 1 | $21,750 | $0 | $21,750 |

CONFIDENTIAL

119-29221-8 - Integrated Solution

| Description | Quantity | Unit Price | Total | Unit Maintenance | Year One Maintenance |
|---|---|---|---|---|---|
| [L]ivescan Interface Installation | 1 | | $4,640 | $4,640 | $0 |
| [T]icket Writer Interface (Supports Brazos) Installation | 1 | | $0 | $0 | $0 |
| [C]itizen Reporting Interface Installation | 1 | | $2,320 | $2,320 | $0 |
| [L]aw Enforcement Records Configuration (up to 10 agencies) | 1 | | $8,700 | $8,700 | $0 |
| [L]aw Enforcement Records Train the Trainer Training (includes 10 trainers ea.) | 1 | | $4,350 | $4,350 | $0 |
| [L]aw Enforcement Records Go-Live Support | 1 | | $17,400 | $17,400 | $0 |
| [L]aw Enforcement and Fire Mobile Messaging and Law Enforcement Field Based Reporting Configuration | 1 | | $14,500 | $0 | $14,500 |
| [L]aw Enforcement and Fire Mobile Messaging and Law Enforcement Field Based Reporting Training (10 trainers ea.) | 1 | | $8,700 | $0 | $8,700 |
| [L]aw Enforcement and Fire Mobile Messaging and Law Enforcement Field Based Reporting Go-Live | 1 | | $21,750 | $0 | $21,750 |
| [A]dvanced Field Reporting Configuration | 1 | | $5,800 | $5,800 | $0 |
| [L]aw Enforcement Field Based Accident Reporting Configuration | 1 | | $5,800 | $5,800 | $0 |
| [B]razos Set Up & Config | 1 | | $14,500 | $14,500 | $0 |
| [B]razos Project Mgmt (plus per diem as needed if not remote) | 1 | | $7,000 | $7,000 | $0 |
| [B]razos Training | 4 | | $1,000 | $4,000 | $0 |
| [B]razos Misc. Services: Additional Child Configurations/Set Up | 19 | | $6,500 | $123,500 | $0 |
| [B]razos New World Interface: Set Up & Configuration | 1 | | $0 | $0 | $0 |
| [B]razos Set Up Fees - Third Party Hardware | 210 | | $50 | $10,500 | $0 |
| [S]ociocrata Advanced Implementation Services | 1 | | $2,320 | $2,320 | $0 |
| [E]nterprise Law Enforcement Records Additional Modules | | | | | $0 |
| **TOTAL:** | | | | | **$268,615** |

## [T]hird Party Hardware, Software and Services

| Description | Quantity | Unit Price | Total | Unit Maintenance | Year One Maintenance |
|---|---|---|---|---|---|
| [E]mbedded Third Party Software | 1 | $54,500 | $54,500 | $11,445 | $11,445 |
| [G]eo-File Maintenance Software (ArcGIS for Desktop Standard) / [p]er Workstation | 1 | $6,000 | $6,000 | $1,260 | $1,260 |
| [R]ed Hat Enterprise Linux Server (3-year subscription) | 1 | $2,500 | $2,500 | $0 | $0 |
| *3rd Party Hardware Sub-Total:* | | | *$0* | | *$0* |
| *3rd Party Software Sub-Total:* | | | $63,000 | | *$12,705* |
| *Less Discount:* | | | | | *$12,705* |
| **TOTAL:** | | | **$63,000** | | **$0** |

## [S]ummary

**[T]otal Tyler Software**

| One Time Fees | Recurring Fees |
|---|---|
| $1,027,998 | $216,541 |

**Summary**

| | One Time Fees | Recurring Fees |
|---|---|---|
| Total Annual Fees | | $54,102 |
| Total Tyler Services | $268,615 | |
| Total Other Costs | $0 | |
| Total Third Party Hardware, Software and Services | $63,000 | $12,705 |
| Travel and Living Expenses | $89,370 | |
| **Summary Total** | **$1,448,983** | **$283,348** |

**Optional Tyler Software and Related Services**

| Description | License | Discount | License Total | Maintenance |
|---|---|---|---|---|
| Law Enforcement Records Management System | | | | |
| Multi-Server Search | $5,500 | $2,750 | $2,750 | $578 |
| Sub Total: | $5,500 | $2,750 | $2,750 | $578 |
| Less Discount: | $2,750 | | | $578 |
| TOTAL: | $2,750 | | $2,750 | $0 |

**Optional Services**

| Description | Quantity | Unit Price | Discount | Total |
|---|---|---|---|---|
| Enterprise Law Enforcement Records Additional Modules | | | | $1,160 |
| TOTAL: | | | | $1,160 |

# Assumptions

Personal Computers must meet the minimum hardware requirements for New World products. Microsoft Windows 7/8.1/10 32/64 bit or later is required for all client machines. Windows Server 2012/2016 and SQL Server 2012/2014/2016 are required for the Application and Database Server(s).

New World product requires Microsoft Windows Server 2012/2016 and SQL Server 2012/2016, including required Client Access Licenses (CALs) for applicable Microsoft products. Servers must meet minimum hardware requirements provided by Tyler. The supported Microsoft operating system and SQL versions are specific to Tyler's release versions.

New World product requires Microsoft Excel or Windows Search 4.0 for document searching functionality; Microsoft Word is required on the application server for report formatting.

Tyler recommends a 100/1000MB (GB) Ethernet network for the local area network. Wide area network requirements vary based on system configuration, Tyler will provide further consultation for this environment.

Does not include servers, workstations, or any required third-party hardware or software unless specified in this Investment Summary. Client is responsible for any third-party support.

Licensed Software, and third-party software embedded therein, if any, will be delivered in a machine readable form to Client via an agreed upon network connection. Any taxes or fees imposed are the responsibility of the purchaser and will be remitted when imposed.

Tyler's GIS implementation services are to assist the Client in preparing the required GIS data for use with the Licensed New World Software. Depending upon the Licensed Software the Client at a minimum will be required to provide an accurate street centerline layer and the appropriate polygon layers needed for Unit Recommendations and Run Cards in an industry standard Esri file format (Personal Geodatabase, File Geodatabase, Shape Files). Client is responsible for having clearly defined boundaries for Police Beats, EMS Districts and Fire Quadrants. If necessary Tyler will assist Client in creating the necessary polygon layers (Police Beats, EMS Districts and Fire Quadrants) for Unit Recommendations and Run Cards. Tyler is not responsible for the accuracy of or any ongoing maintenance of the GIS data used within the Licensed New World Software.

Client is responsible for any ongoing annual maintenance on third-party products, and is advised to contact the third-party vendor to ensure understanding of and compliance with all maintenance requirements

All Tyler Clients are required to use Esri's ArcGIS Suite to maintain GIS data. All maintenance, training and ongoing support of this product will be contracted with and conducted by Esri. Maintenance for Esri's ArcGIS suite of products that are used for maintaining Client's GIS data will be contracted by Client separately with Esri.

CAD Maintenance includes 24/7 Support.

When Custom interface is included, Custom interface will be operational with existing third-party software. Any subsequent changes to third-party applications may require additional services.

When State/NCIC is included, Client is responsible for obtaining the necessary State approval and any non-Tyler hardware and software. Includes state-specific standard forms developed by Tyler. Additional forms can be provided for an additional fee.

Unless a Workstation License is included, New World CAD includes 18 licenses.

## Assumptions

Configuration and end user training for Decision Support Software to occur after Client has been live for 3 months or longer on an application. Classes are limited to 10 trainees maximum; service and travel costs will be incurred for additional classes.

New World Virtual Message Switch (VMS) requires Red Hat Enterprise Linux Operating System Ver. 7 with an active Red Hat Standard Subscription Support Agreement. Virtual machine specifications must meet minimum requirements provided by Tyler. Supported Tyler Public Safety releases include 10.2 SP13 (or higher), 2017.1, 2017.2 and 2018.1 (or higher).

A Workstation License for up to 500 workstations is included for the Licensed Standard Software. The Workstation License includes the following agencies as authorized users:

- Argentine Township Police Department
- Burton City Police Department
- Clayton Township Police Department
- Clio City Police Department
- Davison City Police Department
- Davison Township Police Department
- Flint Township Police Department
- Flint Police Department
- Flint Bishop Airport Police Department
- Flushing City Police Department
- Flushing Township Police Department
- Gaines Police Department
- Genesee County Parks Police Department
- Genesee County Sheriff's Office
- Genesee Township Police Department
- Grand Blanc City Police Department
- Grand Blanc Township Police Department
- Linden City Police Department
- Mt. Morris Township Police Department
- Mt. Morris City Police Department
- Metro Police Department
- Montrose Police Department
- Mott College Police Department
- Otisville Police Department
- Richfield Township Police Department



**Exhibit B**
**Invoicing and Payment Policy**

We will provide you with the software and services set forth in the Investment Summary.  Capitalized terms not otherwise defined will have the meaning assigned to such terms in the Agreement.

**Invoicing**:  We will invoice you for the applicable license and services fees in the Investment Summary as set forth below.  Your rights to dispute any invoice are set forth in the Agreement.

1.  Tyler Software.

 1.1 *License Fees*:  License fees will be invoiced fifty percent (50)% on the Effective Date; twenty-five percent (25%) twelve (12) months after the Effective Date; twenty five (25%) eighteen (18) months from the Effective Date.

 1.2 *Maintenance and Support Fees (including Esri and Embedded Third Party Software)*:

 1.2.1 The maintenance and support fees listed in Figure 1 below in the amount of 105,976 are waived two (2) years from the Effective Date. Year 3 maintenance and support fees listed in Figure 1 below in the amount of $105,976 are payable two (2) years from the Effective Date. Subsequent maintenance and support fees, at our then-current rates, are invoiced annually in advance of each anniversary thereof.

 1.2.2 Remaining Year 1 maintenance and support fees are waived eighteen (18) months from the Effective Date.  Prorated Year 2 maintenance and support fees in the amount of $61,635, are payable eighteen (18) months from the Effective Date. Year 3 maintenance and support fees in the amount of $123,270 will be invoiced two (2) years from the Effective Date in a lump sum with the maintenance and support fees set forth in paragraph 1.2.1. Subsequent maintenance and support fees, at our then-current rates, are invoiced annually in advance of each anniversary thereof.

 1.3 *Subscription Fees*: Your initial 3-year subscription fees for RedHat, as identified in Exhibit A, will be invoiced when we make the product available to you. Subsequent subscription fees for Red Hat are renewable directly through Red Hat Support (renewals@redhat.com).

2.  Professional Services.

 2.1 *Professional Services*: All professional services (including training, project management, systems assurance, standard interfaces and configuration) are billed and invoiced upon the following milestones:

| Milestone | | |
|---|---|---|
| Milestone 1 - Effective Date | $ | 53,723 |
| Milestone 2 - Project Plan Approval | $ | 53,723 |



15

| | | |
|---|---|---|
| Milestone 3 - Initial System Deployment | $ | 53,723 |
| Milestone 4 - End User Training | $ | 53,723 |
| Milestone 5 – Forty five (45) days after the Tyler Software in Exhibit A has been moved to a live production environment and has operated in that environment without a Priority 1 or Priority 2 Defect as defined in Schedule 1 of Exhibit C. | $ | 53,723 |
| **Total** | **$** | **268,615** |

3.  Other Services and Fees.

    3.1 *Brazos Hosting Fees:* Hosting fees for the Brazos software are invoiced annually in advance, beginning on the date we make the applicable environment available to you at the rates set forth in the Investment Summary prorated through the end of your current annual maintenance term. Subsequent annual fees will be at our then-current rates.

    3.2 *New World Hosting Fees:* Hosting Fees for the Tyler Software identified on the Investment Summary are invoiced annually in advance on the date we make the applicable environment available to you and prorated through the end of your current annual maintenance term. Hosting Fees will renew automatically for additional one (1) year terms at our then-current Hosting Services fee, unless terminated in writing by either party at least thirty (30) days prior to the end of the then-current term.

    3.3 *Socrata Hosting Fees:* Your annual SaaS fees for Socrata Law Enforcement Analytics as set forth in the Investment Summary for the initial term of the Socrata Agreement as set forth in Section F(1) of Exhibit F will be invoiced on a pro rata basis on the date we make the applicable environment available to you through the end of your current annual maintenance term and again every twelve months thereafter at our then-current rates.

4.  Third Party Products.

    4.1 *Third Party Software License Fees:* License fees for Third Party Software, if any, are invoiced when we make it available to you for downloading.

    4.2 *Third Party Software Maintenance (excluding Esri and Embedded Third Party Software):* The first year maintenance fees for the Third Party Software, if any, is invoiced when we make that Third Party Software available to you for downloading.

    4.3 *Third Party Hardware:* Third Party Hardware costs, if any, are invoiced upon delivery.

    4.4 *Third Party Services:* Fees for Third Party Services, if any, are invoiced as delivered, along with applicable expenses, at the rates set forth in the Investment Summary.

5.  Expenses. The service rates in the Investment Summary do not include travel expenses for Tyler delivered services. Expenses will be billed as incurred and only in accordance with our then-current Business Travel Policy, plus a 10% travel agency processing fee. Our current Business Travel Policy is attached to this Exhibit B at Schedule 1. Copies of receipts will be provided upon request; we reserve the right to charge you an administrative fee depending on the extent of your requests. Receipts for



miscellaneous items less than twenty-five dollars and mileage logs are not available.

**Payment.** Payment for undisputed invoices is due within forty-five (45) days of the invoice date. We prefer to receive payments electronically. Our electronic payment information is available by contacting AR@tylertech.com.

Maintenance and Support Fees, Brazos Hosting Fees and Socrata SaaS Fees will be invoiced to Client in accordance with this Exhibit B and no invoices will be issued to individual Affiliated Organizations. For Client's convenience, the following chart shows the portion of each type of fee that the respective Affiliated Organization is expected to contribute to Client for the annual term that occurs after the initial period during which the applicable annual fees are waived. Client acknowledges that nothing herein creates a contractual relationship between Client and an Affiliated Organization or Tyler and an Affiliated Organization and that Client remains solely responsible for its payment obligations under this Agreement.

Figure 1

| Affiliated Organization | Number of Sworn Officers | Maintenance and Support Fees | Brazos Hosting Fees | Socrata SaaS Fees |
|---|---|---|---|---|
| Argentine Township Police | 7 | 1,331.83 | 139.52 | 502.69 |
| Burton City Police | 34 | 6,468.91 | 677.68 | 2,441.65 |
| Clayton Township Police | 6 | 1,141.57 | 119.59 | 430.88 |
| Clio City Police | 6 | 1,141.57 | 119.59 | 430.88 |
| Davison City Police | 7 | 1,331.83 | 139.52 | 502.69 |
| Davison Township Police | 18 | 3,424.72 | 358.77 | 1,292.64 |
| Flint Police | 99 | 18,835.95 | 1,973.25 | 7,109.52 |
| Flint Township Police | 42 | 7,991.01 | 837.13 | 3,016.16 |
| Flushing City Police | 10 | 1,902.62 | 199.32 | 718.13 |
| Flushing Township Police | 9 | 1,712.36 | 179.39 | 646.32 |
| Gaines Police | | 0 | 0 | 0 |
| Genesee County Parks | 18 | 3,424.72 | 358.77 | 1,292.64 |
| Genesee County Sheriff | 119 | 22,641.19 | 2,371.88 | 8,545.78 |
| Genesee Township Police | 17 | 3,234.46 | 338.84 | 1,220.83 |
| Grand Blanc City Police | 16 | 3,044.19 | 318.91 | 1,149.01 |
| Grand Blanc Township Police | 40 | 7,610.48 | 797.27 | 2,872.53 |
| Linden City Police | 5 | 951.31 | 99.66 | 359.07 |
| Mt Morris Township Police | 29 | 5,517.60 | 578.02 | 2,082.59 |
| Mt. Morris City Police | 6 | 1,141.57 | 119.59 | 430.88 |
| Metro Police | 24 | 4,566.29 | 478.36 | 1,723.52 |
| Montrose Township Police | 7 | 1,331.83 | 139.52 | 502.69 |
| Mott College Police | 20 | 3,805.24 | 398.64 | 1,436.27 |
| Otisville Police | | 0 | 0 | 0 |
| Richfield Township Police | 8 | 1,522.10 | 159.45 | 574.51 |
| Bishop International Airport Authority | 10 | 1,902.62 | 199.32 | 718.13 |

If, during annual term that occurs after the initial period during which the applicable Brazos hosting fees are

∴ tyler

waived, Client provides thirty (30) days' advance written notice that any one of the above-mentioned agencies is not going to renew for the following annual term, the respective amount of fees will be reduced for that subsequent term by the amount designated for that Affiliated Organization above. For any subsequent term, the amount will be reduced by a percentage proportionate to the amount designated for that Affiliated Organization above.

If, during annual term that occurs after the initial period during which the applicable Scorata SaaS Fees are waived, Client provides thirty (30) days' advance written notice that any number of the above-mentioned Affiliated Organizations is not going to renew for the following annual term, and the total population represented by those Affiliated Organizations that are not renewing exceeds one-hundred thousand (100,000), the amount of Socrata SaaS Fees will be reduced for the applicable subsequent term by ten-thousand dollars ($10,000).





**Exhibit B**
**Schedule 1**
**Business Travel Policy**

1.  Air Travel

    A.  Reservations & Tickets

        The Travel Management Company (TMC) used by Tyler will provide an employee with a direct flight within two hours before or after the requested departure time, assuming that flight does not add more than three hours to the employee's total trip duration and the fare is within $100 (each way) of the lowest logical fare. If a net savings of $200 or more (each way) is possible through a connecting flight that is within two hours before or after the requested departure time and that does not add more than three hours to the employee's total trip duration, the connecting flight should be accepted.

        Employees are encouraged to make advanced reservations to take full advantage of discount opportunities. Employees should use all reasonable efforts to make travel arrangements at least two (2) weeks in advance of commitments. A seven (7) day advance booking requirement is mandatory. When booking less than seven (7) days in advance, management approval will be required.

        Except in the case of international travel where a segment of continuous air travel is six (6) or more consecutive hours in length, only economy or coach class seating is reimbursable. Employees shall not be reimbursed for "Basic Economy Fares" because these fares are non-refundable and have many restrictions that outweigh the cost-savings.

    B.  Baggage Fees

        Reimbursement of personal baggage charges are based on trip duration as follows:

        *   Up to five (5) days = one (1) checked bag
        *   Six (6) or more days = two (2) checked bags

        Baggage fees for sports equipment are not reimbursable.

2.  Ground Transportation

    A.  Private Automobile

        Mileage Allowance – Business use of an employee's private automobile will be reimbursed at the current IRS allowable rate, plus out of pocket costs for tolls and parking. Mileage will be calculated



by using the employee's office as the starting and ending point, in compliance with IRS regulations. Employees who have been designated a home office should calculate miles from their home.

B.  Rental Car

Employees are authorized to rent cars only in conjunction with air travel when cost, convenience, and the specific situation reasonably require their use.  When renting a car for Tyler business, employees should select a "mid-size" or "intermediate" car.  "Full" size cars may be rented when three or more employees are traveling together.  Tyler carries leased vehicle coverage for business car rentals; except for employees traveling to Alaska and internationally (excluding Canada), additional insurance on the rental agreement should be declined.

C.  Public Transportation

Taxi or airport limousine services may be considered when traveling in and around cities or to and from airports when less expensive means of transportation are unavailable or impractical.  The actual fare plus a reasonable tip (15-18%) are reimbursable.  In the case of a free hotel shuttle to the airport, tips are included in the per diem rates and will not be reimbursed separately.

D.  Parking & Tolls

When parking at the airport, employees must use longer term parking areas that are measured in days as opposed to hours.  Park and fly options located near some airports may also be used.  For extended trips that would result in excessive parking charges, public transportation to/from the airport should be considered.  Tolls will be reimbursed when receipts are presented.

3.  Lodging

Tyler's TMC will select hotel chains that are well established, reasonable in price, and conveniently located in relation to the traveler's work assignment.  Typical hotel chains include Courtyard, Fairfield Inn, Hampton Inn, and Holiday Inn Express.  If the employee has a discount rate with a local hotel, the hotel reservation should note that discount and the employee should confirm the lower rate with the hotel upon arrival.  Employee memberships in travel clubs such as AAA should be noted in their travel profiles so that the employee can take advantage of any lower club rates.

"No shows" or cancellation fees are not reimbursable if the employee does not comply with the hotel's cancellation policy.

Tips for maids and other hotel staff are included in the per diem rate and are not reimbursed separately.

Employees are not authorized to reserve non-traditional short-term lodging, such as Airbnb, VRBO, and HomeAway. Employees who elect to make such reservations shall not be reimbursed.

4.  Meals and Incidental Expenses

Employee meals and incidental expenses while on travel status within the continental U.S. are in accordance with the federal per diem rates published by the General Services Administration.



Incidental expenses include tips to maids, hotel staff, and shuttle drivers and other minor travel expenses.  Per diem rates are available at www.gsa.gov/perdiem.

Per diem for Alaska, Hawaii, U.S. protectorates and international destinations are provided separately by the Department of Defense and will be determined as required.

A. Overnight Travel

For each full day of travel, all three meals are reimbursable.  Per diems on the first and last day of a trip are governed as set forth below.

Departure Day

Depart before 12:00 noon                    Lunch and dinner
Depart after 12:00 noon                      Dinner

Return Day

Return before 12:00 noon                    Breakfast
Return between 12:00 noon & 7:00 p.m.       Breakfast and lunch
Return after 7:00 p.m.*                      Breakfast, lunch and dinner

*7:00 p.m. is defined as direct travel time and does not include time taken to stop for dinner.

The reimbursement rates for individual meals are calculated as a percentage of the full day per diem as follows:

- Breakfast      15%
- Lunch          25%
- Dinner         60%

B. Same Day Travel

Employees traveling at least 100 miles to a site and returning in the same day are eligible to claim lunch on an expense report.  Employees on same day travel status are eligible to claim dinner in the event they return home after 7:00 p.m.*

*7:00 p.m. is defined as direct travel time and does not include time taken to stop for dinner.

5. Internet Access – Hotels and Airports

Employees who travel may need to access their e-mail at night.  Many hotels provide free high speed internet access and Tyler employees are encouraged to use such hotels whenever possible.  If an employee's hotel charges for internet access it is reimbursable up to $10.00 per day.  Charges for internet access at airports are not reimbursable.

6. International Travel



All international flights with the exception of flights between the U.S. and Canada should be reserved through TMC using the "lowest practical coach fare" with the exception of flights that are six (6) or more consecutive hours in length. In such event, the next available seating class above coach shall be reimbursed.

When required to travel internationally for business, employees shall be reimbursed for photo fees, application fees, and execution fees when obtaining a new passport book, but fees related to passport renewals are not reimbursable. Visa application and legal fees, entry taxes and departure taxes are reimbursable.

The cost of vaccinations that are either required for travel to specific countries or suggested by the U.S. Department of Health & Human Services for travel to specific countries, is reimbursable.

Section 4, Meals & Incidental Expenses, and Section 2.b., Rental Car, shall apply to this section.





**Exhibit C**
**Maintenance and Support Agreement**

We will provide you with the following maintenance and support services for the Tyler Software. Capitalized terms not otherwise defined will have the meaning assigned to such terms in the Agreement.

1. <u>Term</u>. We provide maintenance and support services on an annual basis. The initial term commences on the Effective Date, and remains in effect for one (1) year. The term will renew automatically for additional one (1) year terms unless terminated in writing by either party at least thirty (30) days prior to the end of the then-current term.

2. <u>Maintenance and Support Fees</u>. Your year 1 maintenance and support fees for the Tyler Software are listed in the Investment Summary, and your payment obligations are set forth in the Invoicing and Payment Policy. We reserve the right to suspend maintenance and support services if you fail to pay undisputed maintenance and support fees within thirty (30) days of our written notice. We will reinstate maintenance and support services only if you pay all past due maintenance and support fees, including all fees for the periods during which services were suspended.

3. <u>Maintenance and Support Services</u>. As long as you are not using the Help Desk as a substitute for our training services on the Tyler Software, and you timely pay your maintenance and support fees, we will, consistent with our then-current Support Call Process:

   3.1 perform our maintenance and support obligations in a professional, good, and workmanlike manner, consistent with industry standards, to resolve Defects in the Tyler Software (subject to any applicable release life cycle policy); provided, however, that if you modify the Tyler Software without our consent, our obligation to provide maintenance and support services on and warrant the Tyler Software will be void;

   3.2 provide support during our established support hours, currently Monday through Friday from 8:00 a.m. to 9:00 p.m. (Eastern Time Zone). Emergency 24-hours per day, 7 days per week, support for New World Public Safety CAD only. After 9:00 p.m., the New World CAD phone support will be provided via pager and a support representative will respond to CAD service calls within 30 minutes of call initiation.

   3.3 maintain personnel that are sufficiently trained to be familiar with the Tyler Software and Third Party Software, if any, in order to provide maintenance and support services;

   3.4 provide you with a copy of all releases to the Tyler Software (including updates and enhancements) that we make generally available without additional charge to customers who have a maintenance and support agreement in effect; and

   3.5 provide non-Defect resolution support of prior releases of the Tyler Software in accordance with any applicable release life cycle policy.

4. <u>Client Responsibilities</u>. We will use all reasonable efforts to perform any maintenance and support services



23

remotely.  Currently, we use a third-party secure unattended connectivity tool called Bomgar, as well as GotoAssist by Citrix.  Therefore, you agree to maintain a high-speed internet connection capable of connecting us to your PCs and server(s).  You agree to provide us with a login account and local administrative privileges as we may reasonably require to perform remote services.  We will, at our option, use the secure connection to assist with proper diagnosis and resolution, subject to any reasonably applicable security protocols.  If we cannot resolve a support issue remotely, we may be required to provide onsite services.  In such event, we will be responsible for our travel expenses, unless it is determined that the reason onsite support was required was a reason outside our control.  Either way, you agree to provide us with full and free access to the Tyler Software, working space, adequate facilities within a reasonable distance from the equipment, and use of machines, attachments, features, or other equipment reasonably necessary for us to provide the maintenance and support services, all at no charge to us.  We strongly recommend that you also maintain a VPN for backup connectivity purposes.

5.  <u>Hardware and Other Systems</u>.  If you are a self-hosted customer and, in the process of diagnosing a software support issue, it is discovered that one of your peripheral systems or other software is the cause of the issue, we will notify you so that you may contact the support agency for that peripheral system. We cannot support or maintain Third Party Products except as expressly set forth in the Agreement.

In order for us to provide the highest level of software support, you bear the following responsibility related to hardware and software:

(a)  All infrastructure executing Tyler Software shall be managed by you;
(b)  You will maintain support contracts for all non-Tyler software associated with Tyler Software (including operating systems and database management systems, but excluding Third-Party Software, if any); and
(c)  You will perform daily database backups and verify that those backups are successful.

6.  <u>Other Excluded Services</u>.  Maintenance and support fees do not include fees for the following services: (a) initial installation or implementation of the Tyler Software; (b) onsite maintenance and support (unless Tyler cannot remotely correct a Defect in the Tyler Software, as set forth above); (c) application design; (d) other consulting services; (e) maintenance and support of an operating system or hardware, unless you are a hosted customer; (f) support outside our normal business hours as listed in our then-current Support Call Process; or (g) installation, training services, or third party product costs related to a new release. Requested maintenance and support services such as those outlined in this section will be billed to you on a time and materials basis at our then current rates.  You must request those services with at least one (1) weeks' advance notice.

7.  <u>Current Support Call Process</u>.  Our current Support Call Process for the Tyler Software is attached to this Exhibit C at Schedule 1.





**Exhibit C**
**Schedule 1**
**Support Call Process**

If, after you have cut over to live production use of the Tyler Software, you believe that the Tyler Software is Defective, as "Defect" is defined in the Agreement, then you will notify us by phone, in writing, by email, or through the support website.  Please reference http://www.tylertech.com/client-support for information on how to use these various means of contact.

Documented examples of the claimed Defect must accompany each notice.  We will review the documented notice and when there is a Defect, we shall resolve it at no additional cost to you beyond your then-current maintenance and support fees.

In receiving and responding to Defect notices and other support calls, we will follow the priority categorizations below.  These categories are assigned based on your determination of the severity of the Defect and our reasonable analysis.  If you believe a priority categorization needs to be updated, you may contact us again, via the same methods outlined above, to request the change.

In each instance of a Priority 1 or 2 Defect, prior to final Defect correction, the support team may offer you workaround solutions, including patches, configuration changes, and operational adjustments, or may recommend that you revert back to the prior version the Tyler Software pending Defect correction.

(a)     **Priority 1**: *A Defect that renders the Tyler Software inoperative; or causes the Tyler Software to fail catastrophically.*

After initial assessment of the Priority 1 Defect, if required, we shall assign a qualified product technical specialist(s) within one business (1) hour.  The technical specialist(s) will then work to diagnose the Defect and to correct the Defect, providing ongoing communication to you concerning the status of the correction until the Tyler Software is operational without Priority 1 defect.

The goal for correcting a Priority 1 Defect is 24 hours or less.

(b)     **Priority 2**: *A Defect that substantially degrades the performance of the Tyler Software, but does not prohibit your use of the Tyler Software.*

We shall assign a qualified product technical specialist(s) within four (4) business hours of our receipt of your notice.  The product technical specialist will then work to diagnose and correct the Defect. We shall work diligently to make the correction, and shall provide ongoing communication to you concerning the status of the correction until the Tyler Software is operational without Priority 2 Defect.

The goal for correcting a Priority 2 event is to include a correction in the next Tyler Software



release.

(c)       **Priority 3**: *A Defect which causes only a minor impact on the use of the Tyler Software.*

We may include a correction in subsequent Tyler Software releases.





**Exhibit D**
**Third Party End User License Agreement**

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK



# END USER LICENSE AGREEMENT
## RED HAT® ENTERPRISE LINUX® AND RED HAT APPLICATIONS



PLEASE READ THIS END USER LICENSE AGREEMENT CAREFULLY BEFORE USING SOFTWARE FROM RED HAT. BY USING RED HAT SOFTWARE, YOU SIGNIFY YOUR ASSENT TO AND ACCEPTANCE OF THIS END USER LICENSE AGREEMENT AND ACKNOWLEDGE YOU HAVE READ AND UNDERSTAND THE TERMS. AN INDIVIDUAL ACTING ON BEHALF OF AN ENTITY REPRESENTS THAT HE OR SHE HAS THE AUTHORITY TO ENTER INTO THIS END USER LICENSE AGREEMENT ON BEHALF OF THAT ENTITY. IF YOU DO NOT ACCEPT THE TERMS OF THIS AGREEMENT, THEN YOU MUST NOT USE THE RED HAT SOFTWARE. THIS END USER LICENSE AGREEMENT DOES NOT PROVIDE ANY RIGHTS TO RED HAT SERVICES SUCH AS SOFTWARE MAINTENANCE, UPGRADES OR SUPPORT. PLEASE REVIEW YOUR SERVICE OR SUBSCRIPTION AGREEMENT(S) THAT YOU MAY HAVE WITH RED HAT OR OTHER AUTHORIZED RED HAT SERVICE PROVIDERS REGARDING SERVICES AND ASSOCIATED PAYMENTS.

This end user license agreement ("EULA") governs the use of any of the versions of Red Hat Enterprise Linux, certain other Red Hat software applications that include or refer to this license, and any related updates, source code, appearance, structure and organization (the "Programs"), regardless of the delivery mechanism.

1.  **License Grant.** Subject to the following terms, Red Hat, Inc. ("Red Hat") grants to you a perpetual, worldwide license to the Programs (most of which include multiple software components) pursuant to the GNU General Public License v.2. The license agreement for each software component is located in the software component's source code and permits you to run, copy, modify, and redistribute the software component (subject to certain obligations in some cases), both in source code and binary code forms, with the exception of (a) certain binary only firmware components and (b) the images identified in Section 2 below. The license rights for the binary only firmware components are located with the components themselves. This EULA pertains solely to the Programs and does not limit your rights under, or grant you rights that supersede, the license terms of any particular component.

2.  **Intellectual Property Rights.** The Programs and each of their components are owned by Red Hat and other licensors and are protected under copyright law and under other laws as applicable. Title to the Programs and any component, or to any copy, modification, or merged portion shall remain with Red Hat and other licensors, subject to the applicable license. The "Red Hat" trademark and the "Shadowman" logo are registered trademarks of Red Hat in the U.S. and other countries. This EULA does not permit you to distribute the Programs or their components using Red Hat's trademarks, regardless of whether the copy has been modified. You may make a commercial redistribution of the Programs only if (a) permitted under a separate written agreement with Red Hat authorizing such commercial redistribution, or (b) you remove and replace all occurrences of Red Hat trademarks. Modifications to the software may corrupt the Programs. You should read the information found at http://www.redhat.com/about/corporate/trademark/ before distributing a copy of the Programs.

3.  **Limited Warranty.** Except as specifically stated in this Section 3, a separate agreement with Red Hat, or a license for a particular component, to the maximum extent permitted under applicable law, the Programs and the components are provided and licensed "as is" without warranty of any kind, expressed or implied, including the implied warranties of merchantability, non-infringement or fitness for a particular purpose. Red Hat warrants that the media on which the Programs and the components are provided will be free from defects in materials and manufacture under normal use for a period of 30 days from the date of delivery to you. Neither Red Hat nor its affiliates warrants that the functions contained in the Programs will meet your requirements or that the operation of the Programs will be entirely error free, appear or perform precisely as described in the accompanying documentation, or comply with regulatory requirements. This warranty extends only to the party that purchases subscription services for the Programs from Red Hat and/or its affiliates or a Red Hat authorized distributor.

4.  **Limitation of Remedies and Liability.** To the maximum extent permitted by applicable law, your exclusive remedy under this EULA is to return any defective media within 30 days of delivery along with a copy of your payment receipt and Red Hat, at its option, will replace it or refund the money you paid for the media. To the maximum extent permitted under applicable law, under no circumstances will Red Hat, its affiliates, any Red Hat authorized distributor, or the licensor of any component provided to you under this EULA be liable to you for any incidental or consequential damages, including lost profits or lost savings arising out of the use or inability to use the Programs or any component, even if Red Hat, its affiliates, an authorized distributor and/or licensor has been advised of the possibility of such damages. In no event shall Red Hat's or its affiliates' liability, an authorized distributor's liability or the liability of the licensor of a component provided to you under this EULA exceed the amount that you paid to Red Hat for the media under this EULA.

5.  **Export Control.** As required by the laws of the United States and other countries, you represent and warrant that you: (a) understand that the Programs and their components may be subject to export controls under the U.S. Commerce Department's Export Administration Regulations ("EAR"); (b) are not located in a prohibited destination country under the EAR or U.S. sanctions regulations (currently Cuba, Iran, Iraq, North Korea, Sudan and Syria, subject to change as posted by the United States government); (c) will not export, re-export, or transfer the Programs to any prohibited destination or persons or entities on the U.S. Bureau of Industry and Security Denied Parties List or Entity List, or the U.S. Office of Foreign Assets Control list of Specially Designated Nationals and Blocked Persons, or any similar lists maintained by other countries, without the necessary export license(s) or authorization(s); (d) will not use or transfer the Programs for use in connection with any nuclear, chemical or biological weapons, missile technology, or military end-uses where prohibited by an applicable arms embargo, unless authorized by the relevant government agency by regulation or specific license; (e) understand and agree that if you are in the United States and export or transfer the Programs to eligible end users, you will, to the extent required by EAR Section 740.17(e), submit semi-annual reports to the Commerce Department's Bureau of Industry and Security, which include the name and address (including country) of each transferee; and (f) understand that countries including the United States may restrict the import, use, or export of encryption products (which may include the Programs and the components) and agree that you shall be solely responsible for compliance with any such import, use, or export restrictions.



6.   **Third Party Programs.** Red Hat may distribute third party software programs with the Programs that are not part of the Programs. These third party programs are not required to run the Programs, are provided as a convenience to you, and are subject to their own license terms. The license terms either accompany the third party software programs or can be viewed at http://www.redhat.com/licenses/thirdparty/eula.html. If you do not agree to abide by the applicable license terms for the third party software programs, then you may not install them. If you wish to install the third party software programs on more than one system or transfer the third party software programs to another party, then you must contact the licensor of the applicable third party software programs.

7.   **General.** If any provision of this EULA is held to be unenforceable, the enforceability of the remaining provisions shall not be affected. Any claim, controversy or dispute arising under or relating to this EULA shall be governed by the laws of the State of New York and of the United States, without regard to any conflict of laws provisions. The rights and obligations of the parties to this EULA shall not be governed by the United Nations Convention on the International Sale of Goods.

Copyright © 2010 Red Hat, Inc. All rights reserved. "Red Hat" and the Red Hat "Shadowman" logo are registered trademarks of Red Hat, Inc. "Linux" is a registered trademark of Linus Torvalds. All other trademarks are the property of their respective owners.





**Exhibit D**
**Schedule 1**
**Professional Services**

### 1.   Project Management Services

We shall act as Project Manager to assist you in implementing the Tyler Software.  Project Management Services include:

  a)   Developing an Implementation Plan;
  c)   Providing revised Implementation Plans (if required);
  d)   Providing monthly project status reports; and
  e)   Facilitating project status meetings
    • a project review (kickoff) meeting at your location
    • progress status meeting(s) during implementation via telephone conference or at your location; and
    • a project close-out meeting at your location to conclude the project.
  f)   Consultation with other vendors or third parties, if necessary.

### 2.   Implementation and Training Support Services

Implementation and training support services have been allocated for this project as described in the Investment Summary. Avoiding or minimizing custom or modified features will aid in keeping the support costs to the amount allocated.  The recommended implementation and training support services include:

  a)   implementation of the Tyler Software;
  b)   Training you or assisting with your training on the Tyler Software; and
  c)   tailoring of Tyler Software by our technical staff and/or consultation with our technical staff.

The project management, implementation and training support services provided by us may be performed at your premises and/or at our headquarters in Troy, Michigan (e.g., portions of project management are performed in Troy).

### 3.   Interface and/or Fixed Installation Services

We shall provide interface installation services as described in the Investment Summary.

Our GIS implementation services are to assist you in preparing the required GIS data for use with the Tyler Software. At a minimum, you will be required to provide an accurate street centerline layer and the appropriate polygon layers needed for Unit Recommendations and Run Cards in an industry standard ESRI file format (Personal Geodatabase, File Geodatabase, Shape Files). You are responsible for having clearly defined boundaries for Police Beats, EMS Districts and Fire Quadrants. If necessary, we will assist you in creating the necessary



polygon layers (Police Beats, EMS Districts and Fire Quadrants) for Unit Recommendations and Run Cards. We are not responsible for the accuracy of or any ongoing maintenance of the GIS data used within the Tyler Software.

4. **Hardware Quality Assurance Service**

We shall provide Hardware Systems Assurance of your server(s).

    a)    Hardware Quality Assurance Services (High Availability Environment):
Hardware Systems Assurance and Software Installation:
- Assist with High Level System Design/Layout
- Validate Hardware Configuration and System Specifications
- Validate Network Requirements, including Windows Domain
- Physical Installation of our Application Servers
- Install Operating System and Apply Updates
- Install SQL Server Standard and Apply Updates
- Install New World Applications Software and Apply Updates
- Establish Base SQL Database Structure
- Configure System for Electronic Customer Support (i.e. NetMeeting)
- Tune System Performance Including Operating System and SQL Resources
- Provide Basic System Administrator Training and Knowledge Transfer
- Document Installation Process and System Configuration

5. **Message Switch Operating System Assurance Service**

We shall provide Message Switch Operating System Assurance, which includes:

    a)    Message Switch Operating System Assurance Services:
Operating System Assurance and Software Installation Services:
- Install and update Red Hat Linux Operating System
- Build system user-ids and applicable authorizations
- Migrate all Message Switch data from the old server to the new server (if applicable)
- Verify all scripts are adjusted for new machine
- Migrate all source code from old machine to the new machine
- Compile New World Message Switch programs
- Assure Message Switch operation in the live environment
- Adjust any tables as needed during the assurance phase





**Exhibit E**
**Additional Terms for New World Public Safety and Brazos Hosted Components**

We will provide you with the New World Public Safety and Brazos hosted components of Tyler Software indicated in the Investment Summary of this Agreement. The terms and conditions contained in this document only apply to our provision of those applications. Capitalized terms not otherwise defined will have the meaning assigned to such terms in your License and Services Agreement.

1. <u>Additional Definitions</u>. The following definitions shall apply to this Exhibit:

    1.1. **"Hosted Components"** means the New World Public Safety and Brazos hosted components of Tyler Software identified in the Investment Summary.

    1.2. **"Hosting Services"** means the hosting services Tyler will provide for the Hosted Components for the fees set forth in the Investment Summary. Terms and Conditions for the Hosting Services are set forth in this Exhibit F.

    1.3. **"SLA"** means the service level agreement applicable to the Hosting Services. A copy of Tyler's current SLA is attached hereto as <u>Schedule 1</u>.

    1.4. **"Third Party Services"** means the services provided by third parties, if any, identified in the Investment Summary.

2. <u>Hosting Terms for the Hosted Components</u>.

    2.1. We will either host or engage Third Party Services in order to host the Hosted Components set forth in the Investment Summary for the fees set forth therein. You agree to pay those fees according to the terms of the Invoicing and Payment Policy. In exchange for those fees, we agree to provide the Hosting Services according to the terms and conditions set forth in this Exhibit F, and the other applicable terms of the Agreement. If you fail to pay those fees, we reserve the right to suspend delivery of the applicable Hosting Services after advance written notice to you of our intention to do so.

    2.2. In our sole discretion, we may elect to migrate the Hosting Services to a replacement system (including our own) and will undertake reasonable efforts to complete such transfer during maintenance windows as set forth in the SLA. We will undertake reasonable efforts to provide you with advance written notice of any such transfer. You agree to provide all reasonable assistance and access in connection with any such transfer. In the event the Hosted Components are transferred to our data center and we provide hosting services directly to you, the terms of the SLA will also apply.

    2.3. The initial term for the Hosting Services begins on the date we make the applicable environment available to you and is prorated through the end of your current annual maintenance term. Thereafter, the term will renew automatically for additional one (1) year terms, unless terminated by either party at least thirty (30) days in advance of the upcoming renewal date.

    2.4. Where applicable, we will perform or cause to have performed upgrades of the applications, hardware, and operating systems that support the Hosting Services. These upgrades are performed in commercially reasonable timeframes and in coordination with third-party releases and certifications. We will make available information on industry-standard minimum requirements and supported browsers for accessing the Hosting Services.





**Exhibit E**
**Schedule 1**
**Service Level Agreement for Hosted Components**

**Agreement Overview**

This SLA outlines the information technology service levels that we will provide to you to ensure the availability of the Hosting Services that you have requested us to provide. All other support services are documented in the applicable Support Call Process. All defined terms not defined below have the meaning set forth in the Agreement.

**Definitions**

*Attainment:* The percentage of time a service is available during a billing cycle, with percentages rounded to the nearest whole number.

*Client Error Incident*: Any service unavailability resulting from your applications, content or equipment, or the acts or omissions of any of your service users or third-party providers over whom we exercise no control.

*Downtime*: Those minutes during which the applicable software products are materially unavailable for your use. Downtime does not include those instances in which only a Defect is present.

*Service Availability*: The total number of minutes in a billing cycle that a given service is capable of receiving, processing, and responding to requests, excluding maintenance windows, Client Error Incidents and Force Majeure.

**Service Availability**

The Service Availability of the applicable software products is intended to be 24/7/365. We set Service Availability goals and measures whether we have met those goals by tracking Attainment.

**Client Responsibilities**

Whenever you experience Downtime, you must make a support call according to the procedures outlined in the applicable Support Call Process exhibit. You may escalate through the hosting hotline. You will receive a support incident number. Any Downtime is measured from the time we intake your support incident.

To track attainment, you must document, in writing, all Downtime that you have experienced during a billing cycle. For purposes of this Service Level Agreement, billing cycle shall be based on each calendar quarter. You must deliver such documentation to Tyler within thirty (30) days of a billing cycle's end.

The documentation you provide must substantiate the Downtime. It must include, for example, the support

33



incident number(s) and the date, time and duration of the Downtime(s).

**Tyler Responsibilities**

When our support team receives a call from you that a Downtime has occurred or is occurring, we will work with you to identify the cause of the Downtime (including whether it may be the result of a Client Error Incident or Force Majeure). We will also work with you to resume normal operations.

Upon timely receipt of your Downtime report, outlined above, we will compare that report to our own outage logs and support tickets to confirm that a Downtime for which Tyler was responsible indeed occurred.

We will respond to your Downtime report within thirty (30) days of receipt. To the extent we have confirmed Downtime for which we are responsible, we will provide you with the relief set forth below.

**Client Relief**

When a Service Availability goal is not met due to your confirmed Downtime, we will provide you with relief that corresponds to the percentage amount by which that goal was not achieved, as set forth in the Client Relief Schedule below.

Notwithstanding the above, the total amount of all relief that would be due under this SLA will not exceed 5% of the fee for any one billing cycle. Issuing of such credit does not relieve us of our obligations under the Agreement to correct the problem which created the service interruption. A correction may occur in the billing cycle following the service interruption. In that circumstance, if service levels do not meet the corresponding goal for that later billing cycle, your total credits will be doubled, with equal relief being provided in that later billing cycle.

<u>Client Relief Schedule</u>

| Targeted Attainment | Actual Attainment | Client Relief |
|---|---|---|
| 100% | 98-99% | Remedial action will be taken at no additional cost to you. |
| 100% | 95-97% | Remedial action will be taken at no additional cost to you. 4% credit of fee for affected billing cycle will be posted to next billing cycle |
| 100% | <95% | Remedial action will be taken at no additional cost to you. 5% credit of fee for affected billing cycle will be posted to next billing cycle |

You may request a report from us that documents the preceding billing cycle's Service Availability, Downtime, any remedial actions that have been/will be taken, and any credits that may be issued. That report is available by contacting the hosting hotline through the support portal(s).

**Applicability**

tyler

The commitments set forth in this SLA do not apply during maintenance windows, Client Error Incidents, and Force Majeure.

We perform maintenance during limited windows that are historically known to be reliably low-traffic times. If and when maintenance is predicted to occur during periods of higher traffic, we will provide advance notice of those windows and will coordinate to the greatest extent possible with you. When maintenance is scheduled to occur, we will provide approximately two (2) weeks' advance written notice to the contact information that you supply on your notification form. When emergency maintenance is scheduled, you will receive an email at that same contact point.

**Force Majeure**

You will not hold us responsible for meeting service levels outlined in this SLA to the extent any failure to do so is caused by Force Majeure. In the event of Force Majeure, we will file with you a signed request that said failure be excused. That writing will include the details and circumstances supporting our request for relief with clear and convincing evidence pursuant to this provision. You will not unreasonably withhold your acceptance of such a request.





**Exhibit F**
**Socrata Software as a Service Terms and Conditions**

## SECTION A – DEFINITIONS

Capitalized terms not otherwise defined will have the meaning assigned to such terms in the Agreement.

- **"Agreement"** means the agreement under which Tyler has licensed and/or provided access to the Tyler Software Products to Client.
- **"Alert"** means a message that is delivered when Client-defined thresholds are exceeded.
- **"Amendment Investment Summary"** means the agreed upon cost proposal for the products and services attached as Exhibit A.
- **"API"** means application-programming interface.
- **"Client"** means Genesee County 911, MI.
- **"Client Data"** means data, datasets, files, information, content and links uploaded or provided by Client through the use of the SaaS Services, but excluding Third Party Services.
- **"Confidential Information"** means nonpublic information that a reasonable person would believe to be confidential and includes, without limitation, personal identifying information (*e.g.,* Social Security numbers) and trade secrets, each as defined by applicable Michigan law.
- **"Dataset"** means physical collection of information, typically modeled as a table of rows and columns of data.
- **"Data Storage"** means the contracted amount of storage capacity for your Data identified in the Investment Summary.
- **"Effective Date"** means the Amendment Effective Date.
- **"External API Calls"** means any request made by a user that is not logged in against a SaaS Service.  If applicable, the number of External API calls that are authorized are identified in the Investment Summary, attached as Exhibit A.
- **"Invoicing and Payment Policy"** means the invoicing and payment policy.
- **"Monthly Active Users"** means a user that is logged in and accesses the SaaS Services more than ten times per month. If applicable, the number of Monthly Active Users that are authorized to use the SaaS Services for the Agreement are identified in the Investment Summary.
- **"SaaS Fees"** means the fees for the SaaS Services identified in the Investment Summary.  SaaS Fees may be listed or referred to as Recurring Fees in Exhibit A.
- **"SaaS Services"** means Socrata's off the shelf, cloud-based software service and related services, including support services, as specified under this Socrata Agreement. SaaS Services do not include support of an operating system or hardware, support outside of our normal business hours, or training, consulting, or other professional services.
- **"SLA"** means the service level agreement described in Section C of this Socrata Agreement.
- **"Socrata Agreement"** means this Socrata Software as a Service Terms and Conditions.
- **"Socrata"** means Socrata, a wholly owned subsidiary of Tyler Technologies, Inc., a Delaware corporation.
- **"Third-Party Services"** means if any, third-party web-based services or platforms, including but not limited to third party stock photos and third-party map location services which are provided at no

additional charge to you through this Socrata Agreement.

- **"we", "us", "our"** and similar terms mean Tyler.
- **"you"** and similar terms mean Client.

## SECTION B – SAAS SERVICES

1. <u>Rights Granted</u>.  Tyler grants to Client the non-exclusive, non-assignable limited right to use the Socrata Law Enforcement Analytics product on a subscription basis according to the terms of this Socrata Agreement and the SLA. Client may access updates and enhancements to the product, as described in Section C(1).

2. <u>SaaS Fees</u>.  Client agrees to pay Tyler the SaaS Fees. Those amounts are payable in accordance with Tyler's Invoicing and Payment Policy.  The SaaS Fees are based on the number of Monthly Active Users, API usage, Alerts, and the amount of Data Storage required.  Client acknowledges that continued access to the SaaS Services is contingent upon your timely payment of SaaS Fees.  If you fail to timely pay the SaaS Fees, we may discontinue your access to the SaaS Services.  We may also terminate this Socrata Agreement if you don't cure such failure to pay within forty-five (45) days of receiving written notice of our intent to terminate.

3. <u>Ownership</u>.

   3.1 Tyler retains all ownership and intellectual property rights to the SaaS Services.

   3.2 When Client uploads or provides Client Data to the Socrata SaaS platform, Client grants to Tyler a perpetual non-exclusive, worldwide, royalty-free, sub-licensable, and transferable license to use, reproduce, publicly display, distribute, modify, create derivative works of, and translate the Client Data as needed in response to a Monthly Active User's use of the SaaS Services.

   3.3 The SaaS Services provide you with functionality to make all or part of Client Data available to the general public through one or more public facing websites. Client determines which Client Data is shared publicly, and Client is solely responsible for determining the online terms of use and licenses relative to the use by public users ("Public User") of Client Data, and the enforcement thereof. Once an internal user makes Client Data publicly available using the SaaS Services, Tyler has no control over a Public User's use, distribution, or misuse of Client Data. Tyler has no liability or obligation to indemnify for such usage. Users have the ability within the SaaS Services to remove the public permissions applied to Client Data.

   3.4 Tyler reserves the right to develop derivative data assets based on Client's publicly available data. These uses might include but aren't necessarily limited to: aggregating and summarizing data; normalizing, standardizing and concatenating data to create new regional or national data assets; and developing key performance indicators and benchmarks.

   3.5 While Tyler agrees to never commercially sell data Client makes publicly available, we reserve the right to commercially sell derivative data assets we create based on Client's public data.

   3.6 Tyler may develop derivative data assets and insights based on aggregated, anonymized views of Client's internally accessible private data for the purposes of the enhancement of the SaaS Services, aggregated statistical analysis, technical support and other internal business purposes.

   3.7 Client retains all ownership and intellectual property rights to the Client Data.  Client expressly



recognizes that except to the extent necessary to carry out our obligations contained in this Socrata Agreement, Tyler does not create or endorse any data used in connection with the SaaS Services. During the term of the Socrata Agreement, Client may export Client Data as allowed by the functionality within the SaaS Services.

3.8 If Client provides feedback, information, and/or suggestions about the SaaS Services, or any other services provided hereunder, then Tyler (and those it allows to use its technology) may use such feedback, information, and/or suggestions under a royalty-free, paid-up, and irrevocable license without obligation to Client.

4. Restrictions.

4.1 You may not: (a) except as explicitly provided for herein, make the SaaS Services or Documentation resulting from the SaaS Services available in any manner to any third party for use in the third party's business operations; (b) modify, make derivative works of, disassemble, reverse compile, or reverse engineer any part of the SaaS Services; (c) access or use the SaaS Services in order to build or support, and/or assist a third party in building or supporting, products or services competitive to us; (d) license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make the SaaS Services or Documentation available to any third party other than as expressly permitted by this Socrata Agreement; (e) use the SaaS Services to store or transmit infringing, unsolicited marketing emails, libelous, or otherwise objectionable, unlawful or tortious material, or to store or transmit material in violation of third party rights; (f) interfere with or disrupt the integrity or performance of the SaaS Services (including without limitation, vulnerability scanning, penetration testing or other manual or automated simulations of adversarial actions, without Tyler's prior written consent); or (g) attempt to gain unauthorized access to the SaaS Services or its related systems or networks.

4.2 Client acknowledges and understands that the Socrata SaaS Services are not designed to serve as the system of record and shall not be used in a manner where the interruption of the SaaS Services could cause personal injury (including death) or property damage. The SaaS Services are not designed to process or store CJIS, PHI or other sensitive data, and by using the Socrata SaaS Services, you acknowledge and agree that you are using the Socrata SaaS Services at your own risk and that you are solely responsible for use of data with the SaaS Services in any manner that is contrary to the uses for which the Socrata SaaS Services are designed and offered for use in this Agreement.

4.3 Although we have no obligation to screen, edit or monitor the Client Data or Public User content posted on SaaS Services, if, in our reasonable judgment, we discover your use of the SaaS Services threatens the security, integrity, stability, or availability of the SaaS Services, or is otherwise in violation of this Socrata Agreement, we may temporarily suspend the SaaS Services, or Monthly Active Users' access thereto. Unless Client has conducted penetration testing or unscheduled performance testing, Tyler will use commercially reasonable efforts to provide Client with notice and an opportunity to remedy such violation or threat prior to such suspension. Any penetration testing or unscheduled performance testing conducted by Client will result in immediate suspension of the SaaS Services.

5. Reservation of Rights. The SaaS Services, other services, workflow processes, user interface, designs, and other technologies provided by Tyler pursuant to this Socrata Agreement are the proprietary property of Tyler and its licensors. All right, title and interest in and to such items, including all associated intellectual property rights, remain only with Tyler. Client may not remove or modify any proprietary marking or restrictive legends from items or services provided under this Socrata Agreement. Tyler reserves all rights unless otherwise expressly granted in this Socrata Agreement.



6. <u>Access and Usage by Internal Client Users and Contractors</u>. You may allow your internal users and third party contractors to access the SaaS Services and any technical or policy controls, in compliance with the terms of this Socrata Agreement, which access must be for your sole benefit. You are responsible for the compliance with this Socrata Agreement by your internal users and contractors.

7. <u>Your Responsibilities</u>. Client (a) must keep its passwords secure and confidential; (b) is solely responsible for all activity occurring under its account; (c) must use commercially reasonable efforts to prevent unauthorized access to its account and notify Tyler promptly of any such unauthorized access; (d) may use the SaaS Services only in accordance with the Documentation; and (e) shall comply with all federal, state and local laws, regulations and policies of Client, as to its use of the SaaS Services, Client Data, and instructions to Tyler regarding the same.

8. <u>Client Data Backup</u>.  Client is providing Socrata a copy of Client Data. Any laws and regulations governing Client for retention of Client Data remains Client's responsibility. CLIENT IS SOLELY RESPONSIBLE FOR BACKING UP CLIENT DATA unless otherwise specially agreed in writing between Tyler and Client.

9. <u>Return of Client Data</u>. Upon request, Tyler will make the SaaS Services available to Client to export Client Data for a period of sixty (60) days following the termination of this Socrata Agreement. After such sixty (60) day period has expired, we have no obligation to maintain Client Data and may destroy the Client Data.

10. <u>APIs</u>.  Tyler will provide access to the applicable application-programming interface ("API") as part of the SaaS Services under the terms of this Socrata Agreement. Subject to the other terms of this Socrata Agreement, Tyler grants Client a non-exclusive, nontransferable, terminable license to interact only with the SaaS Services as allowed by the current APIs.

    a. Client may not use the APIs in a manner--as reasonably determined by Tyler--that exceeds the purposes defined in the Investment Summary, constitutes excessive or abusive usage, or fails to comply with any part of the APIs. If any of these occur, Tyler can suspend or terminate Client's access to the APIs on a temporary or permanent basis.

    b. Tyler may change or remove existing endpoints or fields in API results upon at least 30 days' notice to Client, but Tyler will use commercially reasonable efforts to support the previous version of the APIs for at least 6 months from deprecation notice. Tyler may add new endpoints or fields in API results without prior notice to Client.

    c. The APIs may be used to connect the SaaS Services to certain hosted or on premise software applications not provided by Tyler ("Non-Tyler Applications").  Client is solely responsible for development, license, access to and support of Non-Tyler Applications, and Client's obligations under this Socrata Agreement are not contingent on access to or availability of any Non-Tyler Application.

    d. Any open source code provided is provided as a convenience to you. Such open source code is provided AS IS and is governed by the applicable open source license that applies to such code; provided, however, that any such open source licenses will not materially interfere or prohibit Client's limited right to use the SaaS Services for its internal business purposes.

11. <u>Data Security Measures</u>. In order to protect your Confidential Information, we will: (a) implement and maintain all reasonable security measures appropriate to the nature of the Confidential Information



39

including without limitation, technical, physical, administrative and organizational controls, and will maintain the confidentiality, security and integrity of such Confidential Information; (b) implement and maintain industry standard systems and procedures for detecting, mitigating, and responding to attacks, intrusions, or other systems failures and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures; (c) designate an employee or employees to coordinate implementation and maintenance of its Security Measures (as defined below); and (d) identify reasonably foreseeable internal and external risks to the security, availability, confidentiality, and integrity of Confidential Information that could result in the unauthorized disclosure, misuse, alteration, destruction or other compromise of such information, and assess the sufficiency of any safeguards in place to control these risks (collectively, Security Measures). Client acknowledges and agrees that Tyler's obligations with respect to Security Measures is subject to Section B(4.2) above.

12. <u>Notice of Data Breach</u>. If Tyler knows that Confidential Information has been accessed, disclosed, or acquired without proper authorization and contrary to the terms of this Socrata Agreement, we will alert Client of any such data breach in accordance with applicable law, and take such actions as may be necessary to preserve forensic evidence and return the SaaS Services to standard operability. If so required, Tyler will provide notice in accordance with applicable federal or State of Michigan data breach notification laws.

13. <u>Confidentiality</u>.  Both parties recognize that their respective employees and agents, in the course of performance of this Socrata Agreement, may be exposed to Confidential Information and that disclosure of such information could violate rights to private individuals and entities, including the parties. Confidential Information is nonpublic information that a reasonable person would believe to be confidential and includes, without limitation, personal identifying information (e.g., Social Security numbers) and trade secrets, each as defined by applicable Michigan law ("Confidential Information"). Each party agrees that it will not disclose any Confidential Information of the other party and further agrees to take all reasonable and appropriate action to prevent such disclosure by its employees or agents. The confidentiality covenants contained herein will survive the termination or cancellation of this Socrata Agreement. This obligation of confidentiality will not apply to information that:

    (a) is in the public domain, either at the time of disclosure or afterwards, except by breach of this Socrata Agreement by a party or its employees or agents;

    (b) a party can establish by reasonable proof was in that party's possession at the time of initial disclosure;

    (c) a party receives from a third party who has a right to disclose it to the receiving party; or

    (d) is the subject of a legitimate disclosure request under the open records laws or similar applicable public disclosure laws governing this Socrata Agreement; provided, however, that in the event you receive an open records or other similar applicable request, you will give us prompt notice and otherwise perform the functions required by applicable law.

## SECTION C – OTHER SERVICES

1. <u>Service Level Agreement (SLA) & Warranty</u>.

    1.1 <u>Service Warranty</u>. Tyler warrants to Client that the functionality or features of the SaaS Services will substantially perform as communicated to Client in writing, or their functional equivalent, but Tyler has the right to update functionality. The support policies may change but will not materially degrade during the term. Tyler may deprecate features upon at least 30 days' notice to Client, but Tyler will use commercially reasonable efforts to support the previous features for at least 6 months following the



# Genesee County 911 LSA

Final Audit Report                                                    2020-12-16

| | |
|---|---|
| Created: | 2020-12-15 |
| By: | Ruth Ann Hines (ruthann.hines@tylertech.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAQDKaVH7ox2iitCNt1NdctymGHbcHtHGY |

# "Genesee County 911 LSA" History

📄 Document created by Ruth Ann Hines (ruthann.hines@tylertech.com)
2020-12-15 - 11:32:13 PM GMT- IP address: 68.40.141.227

📧 Document emailed to Bryan Proctor (bryan.proctor@tylertech.com) for signature
2020-12-15 - 11:32:56 PM GMT

📄 Email viewed by Bryan Proctor (bryan.proctor@tylertech.com)
2020-12-16 - 0:15:27 AM GMT- IP address: 68.37.174.185

✍ Document e-signed by Bryan Proctor (bryan.proctor@tylertech.com)
Signature Date: 2020-12-16 - 0:17:14 AM GMT - Time Source: server- IP address: 68.37.174.185

✔ Agreement completed.
2020-12-16 - 0:17:14 AM GMT

**Adobe Sign**

SECTION F – TERM

1. <u>Term</u>.  The initial term of this Socrata Agreement begins on the date we make the environment available to you and runs through the end of your current annual maintenance term under the Agreement, unless earlier terminated as set forth below. Upon expiration of the initial term, this Socrata Agreement will renew automatically for additional one (1) year renewal terms unless terminated in writing by either party at least sixty (60) days prior to the end of the then-current renewal term. Your right to access or use the SaaS Services will terminate at the end of this Socrata Agreement.

SECTION G – LIMITATION OF LIABILITY

1. <u>DISCLAIMER</u>.  EXCEPT FOR THE EXPRESS WARRANTIES PROVIDED IN THIS SOCRATA AGREEMENT AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WE HEREBY DISCLAIM ALL OTHER WARRANTIES AND CONDITIONS, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES, DUTIES, OR CONDITIONS OF MERCHANTABILITY, TITLE OR FITNESS FOR A PARTICULAR PURPOSE. WHILE TYLER TAKES REASONABLE PHYSICAL, TECHNICAL AND ADMINISTRATIVE MEASURES TO SECURE THE SAAS SERVICES, TYLER DOES NOT GUARANTEE THAT THE SAAS SERVICES CANNOT BE COMPROMISED. YOU UNDERSTAND THAT THE SAAS SERVICES MAY NOT BE ERROR FREE, AND USE MAY BE INTERRUPTED.

2. <u>LIMITATION OF LIABILITY</u>.  OUR LIABILITY FOR DAMAGES ARISING OUT OF THIS SOCRATA AGREEMENT, WHETHER BASED ON A THEORY OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, SHALL BE LIMITED TO YOUR ACTUAL DIRECT DAMAGES, NOT TO EXCEED THE THEN-CURRENT ANNUAL SOCRATA SAAS FEES PAYABLE BY YOU. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE PRICES SET FORTH IN THIS SOCRATA AGREEMENT ARE SET IN RELIANCE UPON THIS LIMITATION OF LIABILITY AND TO THE MAXIMUM EXTENT ALLOWED UNDER APPLICABLE LAW, THE EXCLUSION OF CERTAIN DAMAGES, AND EACH SHALL APPLY REGARDLESS OF THE FAILURE OF AN ESSENTIAL PURPOSE OF ANY REMEDY. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO THE INDEMNIFICATION OBLIGATIONS UNDER THE AGREEMENT.

3. <u>EXCLUSION OF CERTAIN DAMAGES</u>.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL WE BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

